

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-26-2004

# Rivas v. Passaic

Precedential or Non-Precedential: Precedential

Docket No. 02-3875

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Rivas v. Passaic" (2004). *2004 Decisions.* Paper 741.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/741

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT
_____

Nos. 02-3875 and 02-3916
_____

MILAGROS RIVAS, Individually and
as Administrator ad Prosequendum of
the ESTATE OF CARLOS RIVAS;
AMAUREY RIVAS; SAGRARIO
RIVAS; CARLOS RIVAS, JR.;
AMINABEL RIVAS; PALOMA
RIVAS

v.

CITY OF PASSAIC; PASSAIC
POLICE DEPARTMENT; CITY OF
PASSAIC-EMT DIVISION; ROSS
CAPUANA, POLICE OFFICER, #234;
PAUL SLATER, POLICE OFFICER,
#283; ROBERT CALLAGHAN,
POLICE OFFICER, #271; G.
CACERES, POLICE OFFICER, #307;
FARALLO, POLICE OFFICER, #299;
O'DONNELL, POLICE OFFICER,
#301; ROBERT LONGO, POLICE
OFFICER, #261; GEORGE GARCIA,
EMT; AMALIN RODRIGUEZ, EMT;
MIKE LOVITCH, PARAMEDIC; BILL
WALSH, PARAMEDIC;
PASSAIC-CLIFTON MICU; JOHN
DOES I THROUGH X

George Garcia; Amalin Rodriguez,
Appellants,
02-3875

*City of Passaic; *Passaic Police
Department; Police Officer Paul
Slater, #283; Police Officer
Ross Capuana, #234; Police
Officer Robert Callaghan, #271;
Police Officer Farallo, #299;
Police Officer O'Donnell, #301;
Police Officer Robert Longo, #261,
Appellants 02-3916

*Dismissed per Court Order dated
2/27/03

_____

On Appeal from
the United States District Court for the
District of New Jersey
Civil Action No. 99-CV-3523
District Judge: Honorable William Walls
_____

Argued on December 12, 2003
_____

Before: AMBRO, FUENTES, and
GARTH, <u>Circuit</u> <u>Judges</u>

(Filed:  April 26, 2004)
_____

David L. Ganz, Esq. (Argued)
Ganz & Savin, LLP
Five Ryder Road
Fair Lawn, New Jersey 07410
*Counsel for Appellants Garcia and
Rodriguez*

Peter W. Till, Esq. (Argued)
Law Offices of Peter W. Till
105 Morris Avenue, Suite 201
Springfield, New Jersey 07081
*Counsel for Appellant Farallo*

Anthony J. Fusco, Jr., Esq.
Fusco & Macaluso
150 Passaic Avenue
P.O. Box 838
Passaic, New Jersey 07055
*Counsel for Appellant O'Donnell*

Nicholas J. Palma, Esq.
1426 Broad Street
Clifton, New Jersey 07013
*Counsel for Appellant Slater*

Joel M. Miklacki, Esq.
300 Broadacres Drive, 3rd Floor
Bloomfield, New Jersey 07003
*Counsel for Appellant Callaghan*

Miles Feinstein, Esq.
1135 Clifton Avenue
Clifton, New Jersey 07013
*Counsel for Appellant Capuana*

Kathleen C. Goger, Esq. (Argued)
Singer & Goger
Renaissance Towers
111 Mulberry Street
Townhouse 1-A
Newark, New Jersey 07102
*Counsel for Appellees*

_____

OPINION OF THE COURT
_____

Garth, <u>Circuit</u> <u>Judge</u>:

This Section 1983 case focuses on the conduct of a group of police officers and medical professionals who responded to an emergency in an apartment where a middle-aged man was experiencing a seizure. The seizure victim, after being restrained, died shortly after the police arrived, thereby prompting a lawsuit by his family. The District Court denied motions brought by the police officers and the medical professionals for summary judgment, giving rise to this appeal. We hold that there are certain material factual disputes that must be resolved by a jury. Accordingly, we will affirm the District Court's order with respect to EMTs Amalin Rodriguez and George Garcia and Police Officers Rosario Capuana, Paul Slater, Robert Callaghan, Mauro Farallo, and Timothy O'Donnell. We will dismiss Police Officer Robert Longo's appeal.

**I.**

On the morning of November 6, 1998, Milagros Rivas awoke in bed to find her 44-year-old husband, Carlos Rivas, shaking uncontrollably. The Rivases lived with their five children on the second and third floors of a two-family house in Passaic, New Jersey. The house had an enclosed front porch, from which a stairwell led up to the Rivases' apartment.

2

## A. *The Initial Medical Response*

Because Mrs. Rivas spoke poor English, she asked one of her children to call 911 for an ambulance. At approximately 7:05 a.m., emergency medical technicians ("EMTs") George Garcia and Amalin Rodriguez arrived on the scene. They were met on the street by Mrs. Rivas, who testified that she immediately informed Rodriguez in Spanish that her husband had experienced some convulsions and that he had previously had seizures. Mrs. Rivas also testified that she advised Rodriguez that Mr. Rivas was taking diabetic medication and that Rodriguez should not talk to or touch Mr. Rivas. This last piece of information seems to have been sound advice because Rodriguez later testified that she had learned as part of her medical training that a patient experiencing a seizure should not be disturbed during the period of the seizure.

Rodriguez followed Mrs. Rivas into the apartment while Garcia parked the ambulance. Mrs. Rivas testified that when they entered the apartment, she found her husband standing in the living room looking ashen. According to her testimony, Mr. Rivas raised his arms in front of him and began walking in their direction "like a zombie," but that she and Rodriguez stepped out of his way. Mrs. Rivas is adamant that her husband never came into physical contact with Rodriguez.

Rodriguez provides a very different account of what transpired when she first entered the apartment. In a sworn declaration submitted to the District Court, Rodriguez claimed that: "Subsequent to my arrival, I was place [sic] in eminent [sic] fear of my life when Carlos Rivas attach [sic] me without provocation, put his arm around my neck, and attempted (my view at the time) to strangle me." This account was corroborated by Garcia, who entered the house after he parked the ambulance. He testified that as he climbed the stairs to the Rivases' apartment he saw Rodriguez and Mrs. Rivas run out of the apartment into a small vestibule at the top of the stairwell followed by Mr. Rivas, who he claims came towards Rodriguez and "put his hands on her shoulders, like choking."

Garcia claims he ducked under Mr. Rivas's arm and wedged himself between Rodriguez and Mr. Rivas, so that he could push Mr. Rivas back. Garcia described Mr. Rivas, who stood approximately 5 feet, 5 inches tall and weighed 240 pounds, as "physically strong." Garcia even went so far as to describe the situation as "life-threatening." Mrs. Rivas disputes these statements as well, claiming that Garcia "did not put his body weight against my husband to protect [Rodriguez], since there was nothing to protect her from."

It is undisputed that Garcia told Rodriguez to go into the apartment and call for police backup. Meanwhile, Mr.

3

Rivas walked through the living room and into a bathroom, where he sat down on a closed toilet and rested his head against a windowsill. Garcia followed closely behind and waited outside the bathroom. After calling for backup, Rodriguez questioned Mrs. Rivas in the kitchen about her husband's condition.

### B. *The Initial Police Response*

The first two police officers to respond to the request for assistance were Robert Callaghan and Paul Slater. Officer Callaghan testified that he and Officer Slater were informed upon their arrival by Garcia that a male patient inside the apartment had assaulted Rodriguez.[1] Officer Callaghan also testified that he and Officer Slater did not receive "any information as to Mr. Rivas' physical condition," but this was disputed by Garcia and Rodriguez, who signed an incident report which states that: "Upon arrival of Police . . . EMT G. Garcia informed the officer's [sic] of the patient's medical history (diabetes and possible seizure hx: RX: Rezulin)."

The two officers proceeded directly to the bathroom, where they found Mr. Rivas sitting on the closed toilet. Officer Callaghan instructed Mr. Rivas to leave the bathroom. Mr. Rivas complied, but remained silent. It was

around this time that a third police officer, Rosario Capuana, entered the apartment. As the three officers escorted Mr. Rivas through the kitchen, Officer Slater claims to have noticed a large knife on the kitchen table, prompting him to remark, "There's a knife on the table. Let's go into the living room." Officer Slater testified that when he placed his hand on Mr. Rivas's shoulder to direct him into the living room, Mr. Rivas became very aggressive and began punching and pushing him in the chest. Officers Slater and Callaghan claim they reacted by trying to restrain Mr. Rivas, and that they all fell to the floor of the living room.

Mrs. Rivas, who was standing in the kitchen when her husband exited the bathroom, paints a very different picture of what transpired. She agrees that one of the officers grabbed her husband's shoulder as they walked through the kitchen, but she claims her husband merely pulled his shoulder away and that he did not attack any of the officers. She testified that the officers threw her husband to the floor without any provocation.

Officer Capuana provided yet a third version. He testified that he was walking in front of Mr. Rivas through the kitchen when he suddenly heard grunting noises behind him. When he turned around, he saw Mr. Rivas experience what appeared to be a seizure, grunting and shaking violently. At his deposition, Capuana could not

---

[1] Officer Slater testified that it was Rodriguez, not Garcia, who informed them about the alleged assault.

recall what Officers Slater and Callaghan were doing at the time, but he was confident that no one was touching Mr. Rivas. He testified that Mr. Rivas fell to the ground and began swinging violently and kicking and that he (Officer Capuana) and the other two officers tried to control Mr. Rivas.

C. *The Struggle to Restrain Mr. Rivas*

The struggle on the living room floor between Mr. Rivas, who fell onto his stomach, and the three police officers continued for several minutes. Officer Slater, who was attempting to restrain Mr. Rivas's left arm, later described it as "a life and death game of twister." Officer Callaghan, who says he was on Mr. Rivas's other side and was attempting to restrain his right arm, testified that Mr. Rivas was "extremely strong, struggled violently and kept pulling away." The third officer, Capuana, kneeled behind Mr. Rivas and tried to pin down his legs. Officer Capuana testified that Mr. Rivas lost control of his bladder during the struggle.

All three officers allege that at one point during the struggle, Mr. Rivas tried to grab Officer Callaghan's pistol from his holster. Officer Capuana testified that Mr. Rivas "actually had it palmed in his hand," but that Officer Callaghan was able to push Mr. Rivas's hand away. Mrs. Rivas disputes this allegation, claiming that her husband, who was on his stomach throughout the struggle, merely reached around blindly with his arm and touched Officer Callaghan's thigh. Officers Callaghan and Slater also allege that they were bitten by Mr. Rivas.[2]

Garcia and Rodriguez stayed out of the fray, but observed most of the altercation. Garcia remembers one of the officers sitting on Mr. Rivas's back, around the waistline. He testified that this officer yelled, "Don't you see he's trying to get into my gun?," and then proceeded to strike Mr. Rivas in the face with a flashlight. Towards the end of the struggle, Garcia left the apartment to retrieve a lightweight stretcher from the ambulance.

Rodriguez remained in the kitchen during the struggle. She did not observe the officers and Mr. Rivas fall to the floor, but she recalls seeing one of the officers place his knee in the middle of Mr. Rivas's back. She also testified that, during the struggle on the floor, one of the officers shoved his flashlight into Mr. Rivas's mouth and left it there for "[p]robably not even five minutes."

---

[2] This allegation is corroborated to some extent by hospital records, which show that Officers Slater and Callaghan were both admitted to Passaic General Hospital for treatment. The records are somewhat difficult to read, but it seems Officer Slater was treated for a leg injury and Officer Callaghan for a wrist injury.

Mrs. Rivas also remained in the kitchen during the struggle. She testified that after the officers threw her husband to the ground, Officer Callaghan sat on his back with his knees straddling Mr. Rivas's torso. She alleges that the officers repeatedly pushed Mr. Rivas's head into the carpet while they tried to handcuff his wrists behind his back. Mrs. Rivas testified that she kept yelling at the police, "It's not like that — he's very sick," but that Officer Callaghan stood up and yelled, "bitch shut your mouth." Mrs. Rivas's daughter gave similar testimony.

### D. *Mr. Rivas is Placed on a Stretcher*

After several minutes passed, a second wave of police officers arrived on scene. They were Officers Mauro Farallo, Timothy O'Donnell, Robert Longo and Glisette Caceras. With their assistance, the officers were able to handcuff Mr. Rivas's hands behind his back and a short time later, Mr. Rivas apparently came out of his seizure and became still. Garcia returned to the apartment and the officers picked Mr. Rivas up and placed him face down on the stretcher. Garcia knew from his EMT training that the proper protocol is to place a patient face up on a stretcher to make sure the airway remains clear, which is particularly important for a seizure victim. Garcia later acknowledged that he became concerned about Mr. Rivas's airway when the officers placed him face-down on the stretcher, but that he did not speak up

because he felt "the scene was taken over by the police." After the officers placed Mr. Rivas on the stretcher, Garcia bound his ankles with cloth restraints.

Once Mr. Rivas was secured in the stretcher, Garcia helped the officers carry him downstairs. They carried him down the stairs head first, even though EMTs are trained to carry patients down stairs feet first. Again, Garcia did not say anything to the police officers.

The Rivas family claims the officers were making crude remarks like, "Damn, he's heavy, this pig, this dog," as they carried Mr. Rivas down the stairs. Near the bottom of the stairwell, one of the straps on the stretcher apparently snapped and Mr. Rivas slid out of the stretcher head first, struck his head, and tumbled down the steps. While he lay on the stairs, he lost control of his bowels and defecated himself. Officers Longo and O'Donnell grabbed Mr. Rivas by his arms and slid him down the remaining stairs and onto the front porch.

Rodriguez, who was standing at the top of the stairs, did not see Mr. Rivas fall out of the stretcher, but she heard the commotion and looked over. The smell of vomit and feces quickly overpowered her and she ran outside. As she passed through the porch, she saw Mr. Rivas laying on the floor with some blood near his head.

Officer Longo testified that Mr.

Rivas became combative on the porch. He testified that, together with Officers Farallo and O'Donnell, he held Mr. Rivas down on the porch. Officer Longo said he held Mr. Rivas down by placing his body weight on top of Mr. Rivas's shoulders, and that the other officers used similar means to restrain Mr. Rivas.

### E. *The Paramedics' Arrival*

It was around this time that paramedics Michael Lovitch and William Walsh arrived. Walsh immediately noticed Mr. Rivas lying face down on the enclosed porch, allegedly moving his head and arms in an effort to resist the police officers who were on top of him. While the paramedics conferred with Rodriguez and Garcia about Mr. Rivas's medical condition, Mr. Rivas suddenly became very still and relaxed.

The officers carried Mr. Rivas to an ambulance stretcher waiting on the sidewalk and placed him face-down in the stretcher, but Lovitch and Walsh instructed the officers to turn Mr. Rivas onto his back. When they did so, Lovitch and Walsh discovered that Mr. Rivas was not breathing and had no pulse. They immediately placed Mr. Rivas in the ambulance and began administering advanced life support. En route to the hospital, the paramedics succeeded in reestablishing a pulse and heart rhythm, but they could not get Mr. Rivas to breathe on his own. At 8:20

a.m., Mr. Rivas was pronounced dead.

### F. *The Medical Examiner's Report*

Later that day, a Medical Examiner conducted a postmortem examination and autopsy of Mr. Rivas's corpse. He noted in his report that Mr. Rivas's two upper front teeth were partially dislodged. The report also noted a number of superficial contusions and abrasions, but the Medical Examiner did not find any evidence of trauma or injury that would have contributed to Mr. Rivas's death. After a toxicology report came back negative, the Medical Examiner concluded that Mr. Rivas had died from a "Cardio-Respiratory Arrest Following Acute Psychotic Episode of Undetermined Etiology," i.e., Mr. Rivas's heart and lungs stopped functioning following a period of intense physical activity, with the cause of the psychotic episode being unknown. The manner of death was listed as "Natural."

### G. *The Rivas Family's Medical Expert*

The Rivas family subsequently hired Dr. Michael Baden, a well-known forensic pathologist, to render a second opinion on Mr. Rivas's cause of death. After reviewing all of the relevant materials, Dr. Baden concluded that the Medical Examiner had correctly found that Mr. Rivas had experienced a respiratory arrest resulting in cardiac arrest. Dr. Baden believed, however, that Mr. Rivas's death followed "an acute medical episode rather than 'an

acute psychotic episode' and the etiology was not 'undetermined' but due to asphyxia caused by police action that prevented Mr. Rivas from breathing." Dr. Baden therefore concluded that the manner of death should have been listed in the Medical Examiner's report as a homicide.

### H. *Ensuing Investigations*

Several state and local agencies investigated the events surrounding Mr. Rivas's death. One such investigation was conducted by the New Jersey Department of Health and Senior Services (the "Health Department"), which oversees the provision of basic life support services by EMTs. The Health Department reviewed the actions taken by Rodriguez and Garcia and ultimately determined that the care they provided to Mr. Rivas "deviated significantly from acceptable EMT-B practice." The Health Department cited five instances of Rodriguez and Garcia's failure to follow proper procedure. They were: (1) placing Mr. Rivas face down in the stretcher; (2) not properly restraining him in the stretcher; (3) carrying him down the stairs head first; (4) failing to take adequate spinal immobilization precautions after Mr. Rivas fell from the stretcher; and (5) not properly completing a patient care report. The Health Department concluded that these five deviations "collectively demonstrate[d] incompetence or inability to provide adequate basic life support services in violation of N.J.A.C. 8:40A-

9.6(a)(1)," and it placed Garcia and Rodriguez on provisional status for six months.

A separate investigation was led by the Internal Affairs Division ("Internal Affairs") of the Passaic Police Department. After interviewing a number of witnesses and reviewing various reports and dispatch tapes, Internal Affairs concluded that the level of force used by the police officers "appeared to have been reasonable and did not appear to be excessive." In reaching that conclusion, Internal Affairs noted that the Medical Examiner's report contained no findings that suggested excessive force had been used.

With respect to the EMTs, Internal Affairs concluded that Rodriguez had panicked and misleadingly told the police officers that Mr. Rivas had attempted to choke her, when in fact he had merely touched her shoulder. Internal Affairs also faulted the EMTs for not furnishing the police officers with adequate medical information about Mr. Rivas's condition and for allowing the police to take control of the scene.

The report issued by Internal Affairs also addressed the allegation that one of the police officers had struck Mr. Rivas in the head with a flashlight. The report noted that this allegation first surfaced when Internal Affairs interviewed Rodriguez and Garcia, but that neither of them had mentioned a

8

blow to Mr. Rivas's head in their initial written reports or interviews with the Health Department. Based on those omissions and the fact that Mrs. Rivas did not see the officers strike her husband, Internal Affairs concluded that Rodriguez and Garcia had fabricated that allegation "in order to shift the burden away from the EMT's and onto the police personnel."

## I. *The Rivas Family Files Suit*

The Rivas family filed this lawsuit in the District Court for the District of New Jersey against the City of Passaic, the Passaic Police Department, the Passaic EMT Division, the responding police officers, EMTs Garcia and Rodriguez, and Paramedics Walsh and Lovitch, Passaic-Clifton MICU (Mobile Intensive Care Unit), and "John Does I through X." The amended complaint alleges violations of both federal and state law. The federal claim is based on 42 U.S.C. § 1983, while the state claims are based on common law tort principles, such as failure to train and supervise, failure to render medical care, intentional and negligent infliction of emotional distress, and assault and battery. Following discovery, the City of Passaic, the Passaic Police Department, and all of the individual defendants except Paramedics Lovitch and Walsh and "John Does I through X" moved for summary judgment.

The District Court granted summary judgment to Officer Caceres,

but denied all of the remaining motions. The District Court explained in an oral opinion that it was denying summary judgment "because of the factual circumstances in contest." The District Court dismissed the Passaic Police Department and the City of Passaic EMT-Division because those two defendants appeared to be departments or divisions of the City of Passaic, which remained responsible for their conduct. With the exception of paramedics Walsh and Lovitch and the Passaic-Clifton MICU, all of the defendants that remained in the lawsuit appealed the District Court's ruling and we subsequently consolidated the appeals.[3]

---

[3] The District Court in its opinion did not address "John Does I through X" and did not rule respecting them. The charging portions of the District Court's Order dated October 4, 2002 and entered on October 8, 2002, read as follows:

1) The motions for summary judgment by defendants City of Passaic, Police Officer Paul Slater, Police Officer Ross Capuana, Police Officer Robert Callaghan, Police Officer Farallo, Police Officer O'Donnell, Police Officer Robert Longo, EMT George Garcia, and EMT Amalin Rodriguez are denied for the reasons placed on the record by the Court on September 30, 2002;

2) The motion for summary judgment by defendant Police Officer G. Caceres is unopposed and is granted; and

9

## II. APPEALABILITY

Before reaching the merits, we address our appellate jurisdiction.

### A. *Officers Longo and Capuana*

The Rivas family has moved to dismiss the appeals of Officers Longo and Capuana.[4] Although both officers filed a notice of appeal, they did not submit written briefs. Pursuant to Federal Rule of Appellate Procedure 31(c), "[i]f an appellant fails to file a brief within the time provided by this rule, or within an extended time, an appellee may move to dismiss the appeal."

Unlike a notice of appeal, which

---

3) Passaic Police Department and City of Passaic EMT-Division are hereby dismissed as defendants, it appearing that they are not separate entities but departments or divisions of defendant City of Passaic which has been and remains responsible for their conduct.

[4] The Rivas family also moved to dismiss the City of Passaic's appeal, asserting that the City of Passaic could not claim qualified immunity and citing *Owen v. City of Independence,* 445 U.S. 622 (1980) to that effect. A panel of this Court granted the Rivas family's motion because, absent the availability of a qualified immunity defense, *see infra at* Section II. B., this Court has no appellate jurisdiction.

if not filed divests our Court of jurisdiction, an appellant's failure to file an appellate brief does not deprive a federal appellate court of jurisdiction and consequently, without more, we do not dismiss an appeal if an appellant fails to file a brief within the prescribed time limits. *See Marcaida v. Rascoe,* 569 F.2d 828, 830 (5th Cir. 1978). We do, however, retain discretion to dismiss such appeals and we choose to invoke that sanction here against Officer Longo because he has neither submitted a written brief nor provided an explanation for his failure to do so. Indeed, Officer Longo did not even respond to the motion to dismiss his appeal.

We will not, however, dismiss Officer Capuana's appeal. Unlike Officer Longo, Officer Capuana submitted a letter from his attorney advising us that he was joining in Officer Callaghan's brief. Although the Rivas family contends that Officer Capuana's "reliance on the Callaghan brief is tantamount to filing no brief at all" because Officer Callaghan's brief "contains no reference to the actions of Officer Capuana," we are not persuaded by that argument. It is true that Officer Callaghan's brief does not focus on Officer Capuana's conduct, but the record contains substantial testimony from, and concerning, Officer Capuana. Moreover, Officers Capuana and Callaghan are similarly situated as they, together with Officer Slater, were the first three officers on the scene and together they restrained Mr. Rivas on the

living room floor.  Consequently, the legal arguments presented in Officer Callaghan's brief apply, in large part, to Officer Capuana as well.  For these reasons, we deny the Rivas family's motion to dismiss Officer Capuana's appeal.

## B.  *Officers Slater, Farallo and O'Donnell and EMTs Garcia and Rodriguez*

The Rivas family has also moved to dismiss the appeals of Officers Farallo and O'Donnell and the appeals of EMTs Garcia and Rodriguez on the ground that the issues raised in their written briefs are evidentiary, and as such are not eligible for interlocutory review.  In addition, the Rivas family moved to dismiss a portion of Officer Slater's appeal for the same alleged problem.

As a general rule, federal appellate courts have jurisdiction to hear appeals only from "final decisions" of the district courts.  *See* 28 U.S.C. § 1291. Accordingly, we normally do not entertain appeals from a district court order denying a motion for summary judgment because such orders do not put an end to the litigation.  *See, e.g., McNasby v. Crown Cork & Seal Co.,* 832 F.2d 47, 49 (3d Cir. 1987).  The United States Supreme Court has explained, however, that certain "collateral orders" amount to final decisions for purposes of taking an appeal even though the district court may have entered those orders before the case

has ended.  *See Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 546-47 (1949).  These "collateral orders" are those orders that (i) conclusively determine the disputed issue, (ii) resolve an important issue entirely separate from the merits of the lawsuit, and (iii) cannot be effectively reviewed on appeal from a final judgment.  *See id.* at 546; *see also Coopers & Lybrand v. Livesay,* 437 U.S. 463, 468 (1978).

Under certain circumstances, orders denying a motion for summary judgment fall within the scope of the collateral order doctrine.  In *Mitchell v. Forsyth,* 472 U.S. 511 (1985), the Supreme Court explained that an order denying a defendant's motion for summary judgment can be immediately appealed so long as: (1) the defendant is a public official asserting a *qualified immunity defense*; and (2) the issue on appeal is whether the facts alleged by the plaintiff demonstrate a violation of clearly established federal law, not which facts the plaintiff might be able to prove at trial.  *Id.* at 528.  The Supreme Court explained in *Mitchell* that this kind of summary judgment order could not await an appeal following trial because a vital importance of a qualified immunity defense is to protect public officials from having to stand trial—a right which cannot be effectively vindicated following trial.  *Id.* at 526.

The *Mitchell* Court found more difficult the "separability" question, that is, whether the issue of qualified

immunity is completely separate from the merits of an underlying lawsuit. The Court concluded, however, that: "it follows from the recognition that qualified immunity is in part an entitlement not to be forced to litigate the consequences of official conduct that a claim of immunity is conceptually distinct from the merits of the plaintiff's claim that his rights have been violated." *Id.* at 527-28. The Court felt that this "conceptual distinctness" made the immediately appealable issue "separate" from the merits of the plaintiff's claim, in part because an:

> appellate court reviewing the denial of the defendant's claim of immunity need not consider the correctness of the plaintiff's version of the facts, nor even determine whether the plaintiff's allegations actually state a claim. All it need determine is a question of law: whether the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions or, in cases where the district court has denied summary judgment for the defendant on the ground that even under the defendant's version of the facts the defendant's conduct violated clearly

established law, whether the law clearly proscribed the actions the defendant claims he took.

*Id.* at 528 (footnote omitted).

In *Johnson v. Jones,* 515 U.S. 304 (1995), the Supreme Court made clear what it had suggested in *Mitchell*, namely, that the collateral order doctrine does not permit an appeal from an order denying a motion for summary judgment if the issue raised on appeal is "whether or not the evidence in the pretrial record [is] sufficient to show a genuine issue of fact for trial." *Id.* at 307.

*Johnson* involved a Section 1983 claim against five police officers for use of excessive force in making an arrest. Three of the officers moved for summary judgment on qualified immunity grounds, arguing that there was insufficient evidence in the record to permit a reasonable juror to find the officers were present when the plaintiff was beaten. The district court denied the motion, concluding that there was enough evidence to defeat summary judgment, and the officers appealed invoking the collateral order doctrine. The Supreme Court unanimously held that appellate jurisdiction was lacking, explaining that *Mitchell* did not permit an appeal from an order denying summary judgment if the order, "though entered in a 'qualified immunity' case, determines only a question of 'evidence sufficiency,' *i.e.*, which facts a party

may, or may not, be able to prove at trial." *Id.* at 313.

We recently announced that we understood *Johnson* to mean that, "if a defendant in a constitutional tort case moves for summary judgment based on qualified immunity and the district court denies the motion, we lack jurisdiction to consider whether the district court correctly identified the set of facts that the summary judgment record is sufficient to prove; but we possess jurisdiction to review whether the set of facts identified by the district court is sufficient to establish a violation of a clearly established constitutional right." *Ziccardi v. City of Philadelpia,* 288 F.3d 57, 61 (3d Cir. 2002) (footnote omitted).

Against this background, we turn to the instant appeals. As noted above, the Rivas family contends that Officers Farallo, Slater and O'Donnell and EMTs Garcia and Rodriguez have improperly raised evidentiary issues on appeal. After carefully reviewing the written briefs, we have decided not to dismiss in their entirety any of the appeals. We find, however, that a number of the issues raised in the briefs are not properly before us. For example, we do not have jurisdiction to review the District Court's denial of qualified immunity to the defendants on the pendent state law claims. While we have recognized that such claims are immediately appealable "if the state has conferred an underlying substantive immunity from suits arising from the

performance of official duties," we have also determined that the State of New Jersey confers no such right. *See Brown v. Grabowski,* 922 F.2d 1097, 1107, 1109 (3d Cir. 1990).[5] Consequently, we lack jurisdiction to consider Officers Farallo's and O'Donnell's arguments that the District Court erred in denying their defense of qualified immunity under New Jersey's Tort Claims Act.

We also dismiss so much of the appeals of Officers Slater and EMTs Garcia and Rodriguez to the extent they raise issues of causation. Officer Slater argues that he cannot be held liable because Mr. Rivas allegedly had an enlarged heart and therefore died from natural causes. In a similar vein, Garcia and Rodriguez contend that none of their actions, omissions, or inactions proximately caused Mr. Rivas's death. While we are aware that a Section 1983 plaintiff must demonstrate that the defendant's actions were the proximate

---

[5] In *Brown*, we were called upon to decide whether New Jersey law bestowed upon its officials the right to not stand trial. After carefully examining New Jersey's statutory and common law, and noting the general reluctance by New Jersey state courts to entertain interlocutory appeals, we concluded that New Jersey law protected state officials only from ultimate liability and did not give them immunity from litigation. *See Brown,* 922 F.2d at 1109.

13

cause of the violation of his federally protected right, *see Martinez v. California,* 444 U.S. 277, 284-85 (1980), the presence of the requisite causation is normally a question of fact for the jury. *See Estate of Bailey v. County of York,* 768 F.2d 503, 511 (3d Cir. 1985), *overruled on other grounds by DeShaney v. Winnebago County Dep't of Social Servs.,* 489 U.S. 189 (1989). As such, evidentiary issues bearing on the merits of the counts do not qualify under *Mitchell* for interlocutory review.

We find that the remaining issues, which we address below, raise legal questions and therefore are properly raised on appeal.

### III. STANDARD OF REVIEW

On review of a denial of summary judgment, we apply a plenary standard of review. *See Fed. Home Loan Mortgage Corp. v. Scottsdale Ins. Co.,* 316 F.3d 431, 443 (3d Cir. 2003). In doing so, we assess the record using the same summary judgment standard that guides the district courts. *See Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 278 (3d Cir. 2000). To prevail on a motion for summary judgment, the moving party must demonstrate "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

### IV. THE MERITS OF THE SUMMARY JUDGMENT MOTIONS

The threshold issue in any Section 1983 lawsuit is whether the plaintiff has sufficiently alleged a deprivation of a constitutional right. *Estate of Smith v. Marasco,* 318 F.3d 497, 505 (3d Cir. 2003). Because Section 1983 does not create any substantive rights, the plaintiff must be able to point to an independent constitutional or statutory right. *Brown v. Commonwealth of Pa. Dep't of Health Emer. Med. Servs. Training Inst.,* 318 F.3d 473, 477 (3d Cir. 2003).

### A. *EMTs Garcia and Rodriguez—"State-Created Danger"*

The Rivas family contends that Garcia and Rodriguez are liable because they allegedly exposed Mr. Rivas to a danger that he otherwise would not have encountered.[6] The Rivas family refers to the "state-created danger" theory of liability. While our consideration of the

---

[6] The Rivas family also asserts that EMTs Garcia and Rodriguez violated Mr. Rivas's substantive due process rights by failing to provide Mr. Rivas with any medical care while he was in police custody (a.k.a. the "special relationship" doctrine). The District Court did not address this claim. Although it did not comment on this argument, we surmise it did not specifically address this claim because of its ultimate ruling. Our review of the record reveals that the elements for a special relationship claim do not exist under the circumstances of this case.

14

"state-created danger" doctrine started with *Brown v. Grabowski,* 922 F.2d 1097 (3d Cir. 1990), it was not until *Kneipp v. Tedder,* 95 F.3d 1199 (3d Cir. 1996) that we held a viable claim could be asserted where the state had created a danger. We explained in *Kneipp* that in order to state such a claim a plaintiff must show: (1) that the harm ultimately caused to the plaintiff was foreseeable and fairly direct; (2) the state actor acted in willful disregard for the plaintiff's safety; (3) there was some relationship between the state and the plaintiff; and (4) the state actor used his authority to create an opportunity for danger that otherwise would not have existed. *Id.* at 1208.

In *Kneipp,* a police officer stopped a married couple returning home on foot after a night of drinking at a local tavern. The police determined that both individuals were intoxicated, but the husband was given permission to leave, and he assumed the police would take his wife either to the hospital or the police station. Instead, the police let the woman proceed home on foot alone. She was found later that night at the bottom of an embankment, where she had fallen and suffered debilitating injuries as a result of her exposure to the cold. On those facts, we held that there was a triable issue as to whether the police had affirmatively placed the wife in a position of danger such that she had made a viable showing under Section 1983. *See id.* at 1201-03.

Applying *Kneipp*'s four elements here, we find that the Rivas family has adduced sufficient evidence (evidence which the EMTs dispute), as to whether Garcia and Rodriguez deprived Mr. Rivas of his right to be free from a state-created danger.

First, was the harm to Mr. Rivas fairly foreseeable? On the morning in question, it is undisputed that Mr. Rivas was suffering from one or more seizures. Both Garcia and Rodriguez knew that Mr. Rivas was either in the throes of, or coming out of, a seizure when they arrived. Both Garcia and Rodriguez had learned during their medical training that seizure victims should not be restrained, even when the convulsions appear to have ended. They had also been instructed to ensure that a patient's airway should remain open and unobstructed.[7] They called for police

---

[7] At his deposition, Garcia was asked what his training had taught him to do when he encountered a seizure victim. Garcia responded that he had been instructed to "try to let the patient have the seizure, . . . give oxygen, call medics as soon as possible and transport the patient." Rodriguez gave similar testimony at her deposition when she testified that, "[w]henever a patient is having a seizure, you have to let the patient finish with the seizure, ALS [Advanced Life Support] has to be there, we have to give oxygen, assess vital signs."

15

assistance shortly after arriving on the scene.

According to the testimony of one of the police officers, Garcia and Rodriguez informed the police that Mr. Rivas had assaulted one of them, but did not inform the police about Mr. Rivas's medical condition or warn the officers that Mr. Rivas should not be restrained. Given this evidence and the inferences most favorable to the Rivas family as the non-movants, a reasonable jury could find that the harm which befell Mr. Rivas was a foreseeable and fairly direct result of the actions taken by Garcia and Rodriguez.

Second, we conclude that the Rivas family has produced sufficient, albeit disputed, evidence to raise a material issue as to whether Garcia and Rodriguez exhibited the standard of culpability necessary to impose liability. Although *Kneipp* remains good law today, recent cases have refined this second element in the four-part test. Most notably, the Supreme Court has held, in the context of a high-speed police chase resulting in death, that a Section 1983 plaintiff had to demonstrate that the police officers' conduct "shocked the conscience" in order to establish a constitutional violation under the Due Process Clause. *County of Sacramento v. Lewis,* 523 U.S. 833 (1998). Because the officers in that case had to act "'in haste, under pressure, and frequently without the luxury of a second chance,'" the

Supreme Court explained that only an "intent to harm" standard of culpability would shock the conscience. *Id.* at 853 (quoting *Whitley v. Albers,* 475 U.S. 312, 320 (1986)).

Because conduct that "shocks the conscience" under one set of circumstances may not have the same effect under a different set of circumstances, the standard of culpability for a substantive due process violation can vary depending on the situation. In *Miller v. City of Philadelphia,* 174 F.3d 368 (3d Cir. 1999), for example, we recognized that a social worker who attempts to remove a child from his or her parents' custody does not, in contrast to a police officer engaged in a high-speed pursuit, have to make split-second decisions. *Id.* at 375. Nevertheless, we noted that a social worker in those circumstances must act with *some* urgency and does not have the luxury of proceeding in a deliberate manner. *Id.* We therefore held that the "shock-the-conscience" test could be met only by adducing evidence that the social worker's actions were grossly negligent or arbitrary, a less onerous standard than an intent-to-harm standard. *Id.* at 375-76.

In *Ziccardi v. City of Philadelphia,* 288 F.3d 57 (3d Cir. 2002)—a case involving emergency medical actions—we further elaborated on the necessary state of mind to prove due process violations in situations where a state actor must act with *some*

16

urgency. We noted that *Miller,* at 174 F.3d at 375-76, "appears to have demanded proof of something less than knowledge that the harm was practically certain but more than knowledge that there was a substantial risk that the harm would occur." *Ziccardi,* 288 F.3d at 66. We ultimately settled on the following test: "[W]e understand *Miller* to require in a case [where an official had to act with some urgency], proof that the defendants consciously disregarded, not just a substantial risk, but a great risk that serious harm would result . . . ." *Id.*

We subsequently held that the "shock-the-conscience" standard also applied to emergency medical personnel. In *Brown v. Commonwealth of Pennsylvania Department of Health Emergency Medical Services Training Institute,* 318 F.3d 473 (3d Cir. 2003), the parents of an infant who died of asphyxia sued, among others, two EMTs who had responded to the 911 call. The parents alleged, among other things, that the EMTs had gotten lost on their way to the child's residence and thereby a delay occurred in removing a grape from the child's throat. *Id.* at 481. We announced in *Brown* that "the 'shocks the conscience' standard should apply in all substantive due process cases if the state actor had to act with some urgency." *Id.* at 480. We further held that the "shock-the-conscience" standard "applied to the actions of emergency medical personnel—who likewise have little time for reflection, typically making decisions in haste and under pressure."

*Id.*

Thus, the Rivas family can only meet the second element of the *Kneipp* test by presenting evidence that Garcia's and Rodriguez's conduct shocks the conscience by consciously disregarding a substantial risk that Mr. Rivas would be seriously harmed by their actions. Rodriguez and Garcia both claim that Mr. Rivas was physically combative and attempted to strangle Rodriguez when she first entered the apartment. If that allegation is true, then it was reasonable for them to call for police back-up.[8] In fact, Garcia testified that the attack on Rodriguez led him to believe that Mr. Rivas was a mental patient, not a seizure victim.

On the other hand, there is evidence in the record which suggests that Mr. Rivas did not attack Rodriguez and that Rodriguez simply panicked at the sight of Mr. Rivas walking towards her with his arms extended in front of him. A jury crediting this version could find that Rodriguez and Garcia unnecessarily called for police assistance. More importantly, it would then appear that there had been a misrepresentation to the police that Mr. Rivas had attacked Rodriguez, leading to the conclusion that Garcia and Rodriguez neglected to tell the police

---

[8] Rodriguez testified that she had been trained to call for backup if she encountered a combative patient.

17

that Mr. Rivas was suffering from a seizure and should not be restrained.[9]

In sum, these contrasting facts satisfy us that summary judgment could not be granted at this stage. A jury could find, based on this version of events, that Garcia and Rodriguez consciously disregarded a great risk of serious harm to Mr. Rivas by misrepresenting the assault and then abandoning Mr. Rivas to the police, particularly since EMTs are supposed to render aid to those in need of medical assistance. If Garcia and Rodriguez misrepresented the assault, not only did they abdicate their duty to render medical assistance, but they placed Mr. Rivas in greater danger by falsely accusing him of acting violently. A jury could find, depending on whose testimony it credits, that such conduct shocks the conscience.[10]

---

[9] Of course, this fact is also in dispute because Rodriguez and Garcia signed an incident report which states that Garcia informed the police officers about Mr. Rivas's medical history when they arrived at the apartment. Garcia, however, seemingly contradicted this account at his deposition. When asked if he said anything to the police officers before they brought Mr. Rivas out of the bathroom, Garcia flatly answered, "No."

[10] Garcia and Rodriguez argue on appeal that the District Court failed to explicitly find which material facts are in dispute. This argument rests largely on our holding in *Forbes v. Township of*

The third element in the *Kneipp* test inquires whether there existed some relationship between the state and the plaintiff. The relationship requirement under the state-created danger theory contemplates a degree of contact such that the plaintiff was a foreseeable victim of the defendant's acts in a tort sense. *See Kneipp,* 95 F.3d at 1209 n.22.

---

*Lower Merion,* 313 F.3d 144 (3d Cir. 2002), in which the district court had held, without elaboration, that the state officials were not entitled to summary judgment on the basis of qualified immunity because the plaintiffs had raised genuine issues of material fact. We announced on appeal a new, prospective rule requiring district courts to "specify those material facts that are and are not subject to genuine dispute and explain their materiality." *Id.* at 146. This rule was necessary, the Court explained, so that future panels could carry out their appellate review function without exceeding the limits of their jurisdiction. *Id.* However, our reading of the record persuades us that, before reaching the merits of the summary judgment motions, the District Court discussed in some detail the underlying facts and, in doing so, identified several disputed facts. To the extent there are any gaps in the District Court's factual recitation, we can "determine what facts the district court, in the light most favorable to the nonmoving party, likely assumed." *Johnson,* 515 U.S. at 319.

In *Morse v. Lower Merion School District,* 132 F.3d 902 (3d Cir. 1997), we explained that the relationship must be sufficiently close to exclude "those instances where the state actor creates only a threat to the general population," but not so restrictive as to limit "the scope of § 1983 to those instances where a specific individual is placed in danger." *Id.* at 913. Attempting to find a workable medium between those two ends of the spectrum, we held in *Morse* that the plaintiff must be "a member of a discrete class of persons subjected to the potential harm brought about by the state's actions." *Id.*

On the existing record, a jury could find that Mr. Rivas was a member of a "discrete class" of individuals subjected to a potential harm caused by Garcia and Rodriguez's actions. The EMTs were responding to a 911 call. The very purpose of their visit to the Rivas household was to provide medical care to Mr. Rivas and to reduce, to the extent possible, the amount of danger in which he found himself as a result of his seizure. If the jury credits Officer Callaghan's testimony that he and Officer Slater were told by the EMTs that Mr. Rivas physically assaulted Rodriguez but were not given any information about his medical condition, it is foreseeable that Mr. Rivas would be among the "discrete class" of persons placed in harm's way as a result of Garcia and Rodriguez's actions. *See Morse,* 132 F.3d at 913 (explaining that "[t]he primary focus when making . . .

[the relationship] determination is foreseeability").

The last element of the *Kneipp* test asks whether the state actor used his or her authority to create an opportunity, which otherwise would not have existed, for the specific harm to occur. *See Kneipp,* 95 F.3d at 1209. A reasonable factfinder could conclude that the EMTs' decision to call for police backup and then (1) inform the officers on their arrival that Mr. Rivas had assaulted Rodriguez, (2) not advise the officers about Mr. Rivas's medical condition, and (3) abandon control over the situation, when taken together, created an opportunity for harm that would not have otherwise existed. Were it not for those acts, Mr. Rivas presumably could have remained in the apartment's bathroom for the duration of his seizure without incident.

B. *The Police Officers—Excessive Force*

The Rivas family asserts that the police used excessive force against Mr. Rivas during their encounter with him and thereby violated his constitutionally protected right. The Supreme Court has held that all claims of excessive force by police officers, in the context of an arrest, investigatory stop, or other "seizure," should be analyzed under the Fourth Amendment. *Graham v. Connor,* 490 U.S. 386, 395 (1989). "A claim for excessive force under the Fourth Amendment requires a plaintiff to show

19

that a seizure occurred and that it was unreasonable." *Curley v. Klem,* 298 F.3d 271, 279 (3d Cir. 2002). A seizure occurs "[w]henever an officer restrains the freedom of a person to walk away." *Tennessee v. Garner,* 471 U.S. 1, 7 (1985). Because it is undisputed that a seizure occurred in this case, the only question is whether it was unreasonable.

An excessive force claim must be evaluated "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" and "must embody the allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are often tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham,* 490 U.S. at 396-97. The inquiry turns on "objective reasonableness," meaning that the standard is whether the police officer's "actions [were] 'objectively reasonable' in light of the facts and circumstances" facing the officer, regardless of the officer's intent or motivation. *Id.* at 397.

Factors to consider in making a determination of reasonableness include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he actively is resisting arrest or attempting to evade arrest by flight." *Graham,* 490 U.S. at 396. Additional factors include "the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." *Sharrar v. Felsing,* 128 F.3d 810, 822 (3d Cir.1997). The reasonableness of the use of force is normally an issue for the jury. *See Abraham v. Raso,* 183 F.3d 279, 290 (3d Cir. 1999).

While some courts "freeze the time frame" and consider only the facts and circumstances at the precise moment that excessive force is applied, other courts, including this one, have considered all of the relevant facts and circumstances leading up to the time that the officers allegedly used excessive force. *See, e.g., Abraham,* 183 F.3d at 291.

### 1. *Officers Capuana, Callaghan, and Slater*

The Rivas family emphasizes that Mr. Rivas committed no crime and presented no threat to anyone when Officers Slater, Callaghan and Capuana arrived at the Rivas household. The family claims the police officers were informed of Mr. Rivas's medical condition upon entering the apartment and should have allowed Mr. Rivas to remain in the bathroom until the paramedics, who were in transit, arrived. Instead, the officers ordered Mr. Rivas to

20

leave the bathroom. The family claims Mr. Rivas had a second seizure as he walked down the hallway and the police officers responded by throwing him to the ground. Officer Capuana's testimony could support the theory that Mr. Rivas had a second seizure as he passed through the kitchen.

The Rivas family emphasizes that the force escalated after Mr. Rivas was on the living room floor. Officer Callaghan allegedly sat on Mr. Rivas's back while the other two officers restrained his legs and attempted to place handcuffs on Mr. Rivas. The family contends the officers repeatedly pushed Mr. Rivas's face into the floor, which made it difficult for him to breathe. According to testimony given by the EMTs, Officer Callaghan jammed a flashlight into Mr. Rivas's mouth at one point during the struggle and later struck him in the head with the same flashlight.[11]

The police officers contend that the level of force they employed was necessary because Mr. Rivas bit them and tried to grab Officer Callaghan's weapon. We must, however, at the summary judgment stage "consider only

---

[11] The medical examiner noted that two of Mr. Rivas's front teeth were partially dislodged, which may corroborate the claim that Officer Callaghan forced a flashlight into Mr. Rivas's mouth.

those facts alleged by [the plaintiff], taken in the light most favorable to him." *Curley,* 298 F.3d at 280. As the District Court pointed out, "Mrs. Rivas argues that her husband could not have reached for anything since he appeared to be in the middle of another seizure and his face was pushed into the floor." We explained in *Bennett v. Murphy,* 274 F.3d 133, 137 (3d Cir. 2002), that a police officer who is accused of having used excessive force is not "precluded from arguing that he reasonably perceived the facts to be different from those alleged by the plaintiff," but that "*contention . . . must be considered at trial.*" *Id.* at 137 (emphasis added). As such, we must assume at the summary judgment stage that Mr. Rivas, who was laying face down on the floor, was simply flailing his arms due to his seizure.

When viewed in the light most favorable to the Rivas family, these facts are sufficient to support the claim that Officers Callaghan, Slater and Capuana may have used excessive force to quiet Mr. Rivas. *See Curley,* 298 F.3d at 280 (finding unreasonable seizure where police officer mistakenly shot port authority officer). Once the officers ordered Mr. Rivas out of the bathroom, they effected a legal seizure by restraining his freedom of movement. Assuming that Mr. Rivas began to have a medical seizure as he and the officers walked through the kitchen (although his condition may not have been recognized by the officers), it was for the jury to

21

decide if the ensuing "takedown" and force applied by the officers was objectively reasonable.

## 2. *Officers Farallo and O'Donnell*

The Rivas family alleges that Officers Farallo and O'Donnell used excessive force on Mr. Rivas after he fell out of the stretcher on the way down the stairs. Specifically, the Rivas family alleges that, "[w]hile Rivas was on the porch, face down, bound hand and foot, having sustained a head injury, bleeding from the nose and mouth, and having been unconscious just minutes before his fall, Farallo and O'Donnell, along with Officer Longo, collectively pressed down on his back with the weight of their bodies until he again lost consciousness, became cyanotic, and died of asphyxiation."

O'Donnell testified that, following Mr. Rivas's fall from the stretcher, he helped carry Mr. Rivas from the stairs to the porch landing, where Mr. Rivas was once again placed face down. Mr. Rivas's hands were handcuffed behind his back and there is evidence suggesting that Mr. Rivas's ankles were still bound by cloth restraints, which had been applied by Garcia before Mr. Rivas was removed from the living room.

Officer O'Donnell, who helped carry Mr. Rivas down the stairs, must have known that Mr. Rivas had just fallen out of the stretcher head first and had lost control of his bowels and had

vomited, clear signs that he was not well. There was also testimony that a pool of blood had formed around Mr. Rivas's head on the porch.

A reasonable jury could find from these facts that Mr. Rivas did not present a threat to anyone's safety as he lay in a prone position on the enclosed porch, hands and ankles secured behind his back. Yet there is testimony in the record that, in order to restrain Mr. Rivas and subdue him, Officers Farallo and O'Donnell, along with Officer Longo, collectively pressed down on Mr. Rivas's back with all of their weight until he became still and unconscious. It was immediately following these acts that the paramedics noticed Mr. Rivas was cyanotic and had stopped breathing. Assuming that Mr. Rivas was handcuffed and had his ankles tied at that time, a reasonable jury could find that the continued use of force against Mr. Rivas was excessive. *See, e.g., Clash v. Beatty,* 77 F.3d 1045 (7th Cir. 1996).

## C. *Qualified Immunity—EMTs*

We turn now to the question of whether Garcia and Rodriguez are entitled to qualified immunity. An appellate court reviewing the denial of a defendant's claim of qualified immunity must ask itself "whether the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions." *Mitchell,* 472 U.S. at 528. Because the incidents in

22

question occurred more than two years after we issued our decision in *Kneipp, supra,* it follows that the right to be free from a state-created danger was clearly established by this Court by November of 1998, when Garcia and Rodriguez responded to the Rivas family's 911 call for medical assistance. Our inquiry does not, however, end there.

It is not enough that the constitutional right was clearly established in a general sense at the time the incident occurred. Rather, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640 (1987). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted." *Saucier v. Katz,* 533 U.S. 194, 202 (2001).

In *Kneipp,* which we discussed earlier, public officials abandoned a victim with whom they had direct contact. In reaching our decision in *Kneipp,* we relied on, among others, the following cases: *Reed v. Gardner,* 986 F.2d 1122, 1127 (7th Cir. 1993) (police officer who removed a sober driver and left behind a passenger whom he knew to be drunk with the keys to the car was subject to liability under 42 U.S.C. § 1983) and *White v. Rochford,* 592 F.2d 381, 385 (7th Cir. 1979) (police officers who arrested uncle for drag racing and left minor children alone in abandoned car on the side of highway deprived children of their due process rights). Both of those cases involved public officials abandoning citizens in dangerous situations.

We discern from these cases that, as of November 1998, our case law had established the general proposition that state actors may not abandon a private citizen in a dangerous situation, provided that the state actors are aware of the risk of serious harm and are partly responsible for creating the opportunity for that harm to happen. As the Supreme Court explained in *Hope v. Pelzer,* 536 U.S. 730 (2002), in some cases "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful.'" *Id.* at 741 (quoting *U.S. v. Lanier,* 520 U.S. 259, 263 (1997) (citation omitted)).

In sum, we find that the pre-existing law of "state-created danger" jurisprudence was clearly established. As such, it was sufficient to put Garcia and Rodriguez on notice that their conduct, if deemed unlawful, would not shield them with immunity.[12]

---

[12] We note that Garcia and Rodriguez do not argue on appeal that they are entitled to qualified immunity because the law was not clearly

23

D. *Qualified Immunity—Police Officers*

The Supreme Court held in *Saucier v. Katz,* 533 U.S. 194 (2001) that qualified immunity also applies to Fourth Amendment excessive force claims. *Id.* at 206. Consequently, even if an officer uses force that was objectively unreasonable, he may nevertheless be protected from individual monetary liability if he reasonably believed, based on the facts and circumstances known to him, that the force used was lawful. Stated somewhat differently, an official who violated an individual's constitutional right, but not a clearly established constitutional right, may have acted in an objectively reasonable manner and would thereby be protected from liability by qualified immunity. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202.

We have discussed this second prong of a qualified immunity defense above when we addressed the Rivas's claims against the EMTs. The factors we noted there are the same factors that

apply here. In sum: under all the circumstances relevant to the officers' restraint and handling of Mr. Rivas, did their actions constitute excessive force and, if they did, was their violation of Mr. Rivas's constitutional right a clearly established one? *Mitchell,* 472 U.S. at 528. Because the facts to be determined are disputed and as such are the function of the jury, the District Court did not err in denying summary judgment to the officers.

**V.**

Because this interlocutory appeal decides only whether the District Court properly held that the defendants were not entitled to summary judgment on the basis of a qualified immunity defense, we do not consider nor do we address the evidentiary arguments raised in the appellants' briefs.[13] *Ziccardi,* 288 F.3d at 61.

**VI.**

We will affirm the District Court Judge's denial of the summary judgment motions filed by EMTs Garcia and Rodriguez and by Police Officers Slater, Callaghan, Capuana, Farallo, and O'Donnell. The District Court Judge

___

established as of November 1998. Instead, they argue that they are entitled to qualified immunity because they did not deprive Mr. Rivas of a constitutional right. We have already addressed that argument in a prior section.

___

[13] We have earlier identified some of the evidentiary arguments that appear in the various appellants' briefs (e.g., proximate cause, pendent state claims, etc.).

24

properly denied their motions, which were based on qualified immunity, because of the contested factual circumstances leading to the harm suffered by Mr. Rivas. We will also dismiss the appeal of Police Officer Longo.[14]

AMBRO, Circuit Judge, concurring in part

I join wholeheartedly in Judge Garth's excellent analysis affirming the District Court's denial of summary judgment to the police officers. While I concur in the judgment as to the EMTs, I write separately to emphasize that, in light of the high threshold for subjecting EMTs to liability on a state action theory, the facts of this case would support liability for the EMTs under a very limited set of circumstances only. Before doing so, I consider the changes to the four-prong test applicable to state-created dangers, set out in *Kneipp v. Tedder*, 95 F.3d 1199 (3d Cir. 1996).

---

[14] The Rivas family has filed a motion to strike certain documents in the appendix on the ground that those documents allegedly were not before the District Court when it issued its ruling. Because we have not relied on any of the disputed documents, we deny the motion.

## I. The *Kneipp* test

The District Court relied on the *Kneipp* test in its analysis of state-created danger. In so doing, it cited principles that have since been refined, if not superseded altogether. The four elements we identified in *Kneipp* were: "1) the harm ultimately caused was foreseeable and fairly direct; (2) the state actor acted in willful disregard for the safety of the plaintiff; (3) there existed some relationship between the state and the plaintiff; [and] (4) the state actors used their authority to create an opportunity that otherwise would not have existed for the third party's crime to occur." *Id.* at 1208 (citing *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1152 (3d Cir. 1995)).

Judge Garth has noted the most important of the recent modifications to the *Kneipp* test, which involved its second prong: in light of the Supreme Court's decision in *County of Sacramento v. Lewis,* 523 U.S. 833, 845-47 (1998), a state actor will be liable only for conduct that "shocks the conscience"; it is no longer enough that she or he has acted in "willful disregard" of the plaintiff's safety. *Brown v. Pa. Dep't of Health Emergency Med. Training Inst.*, 318 F.3d 473, 480 (3d Cir. 2003).

This modification, however, is not the only one. In *Morse v. Lower Merion School District*, 132 F.3d 902 (3d Cir. 1997), we reconsidered the third prong

25

of the *Kneipp* test and suggested that there may be a "relationship" between the state and the plaintiff merely because the plaintiff was a foreseeable victim, either individually or as a member of a discrete class. *Id*. at 914. Moreover, we have written "third party" out of the fourth prong of the test. We recently noted, "The fourth element's reference to a 'third party's crime' arises from the doctrine's origin as an exception to the general rule that the state does not have a general affirmative obligation to protect its citizens from the violent acts of private individuals. The courts, however, have not limited the doctrine to cases where third parties caused the harm. . . ." *Estate of Smith v. Marasco*, 318 F.3d 497, 506 (3d Cir. 2003) (internal citation omitted).

In light of these substantial modifications to the *Kneipp* test, *Kneipp* as shorthand is a misnomer. To be sure, Judge Garth has mentioned the relevant refinements and considered this case by reference to the adapted rubric. I nonetheless believe that continuing to cite the *Kneipp* test as "good law," as Judge Garth does, minimizes the extent to which the law of state-created danger in our Circuit has changed. And while the changes to the third and fourth prongs have expanded the state-created danger doctrine, the substitution of "shocks the conscience" for "willful disregard" is a significant limitation. In this context, our continued adherence to *Kneipp*, if only in name, colors plaintiffs' perception of their burden and

tempts them to allege constitutional violations where none exist.

## II. Does the conduct of the EMTs shock the conscience?

I am persuaded by Judge Garth's analysis that the plaintiffs have alleged sufficient facts for a jury to find that Garcia's and Rodriguez's conduct shocks the conscience. I stress, however, that only a very specific—and highly unlikely—factual resolution would warrant such a finding.

Whether defendants' behavior is conscience-shocking depends on the particular circumstances of a case. *Miller v. City of Philadelphia*, 174 F.3d 368, 375 (3d Cir. 1999). The Supreme Court has, however, provided guidance for application of the standard:

> We have . . . rejected the lowest common denominator of customary tort liability as any mark of sufficiently shocking conduct, and have held that the Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process. . . . It is, on the contrary, behavior at the other end of the culpability spectrum that

26

would most probably support a substantive due process claim; conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level.

*Lewis,* 523 U.S. at 848-49. From *Lewis* we have gleaned several lessons. "The first . . . is that negligence is not enough to shock the conscience under any circumstances. The second is that more culpability is required to shock the conscience to the extent that state actors are required to act promptly and under pressure." *Schieber v. City of Philadelphia*, 320 F.3d 409, 419 (3d Cir. 2003). Moreover, when state actors must balance competing, legitimate interests, the threshold of culpability is higher. *Id.*

We have invoked these principles in setting the standard of culpability applicable to EMTs. In *Brown*, we considered a § 1983 claim against EMTs and the City of Philadelphia alleging violation of the due process rights of a child who died of choking following a botched rescue attempt. We emphasized that "there is no federal constitutional right to rescue services, competent or otherwise. Moreover, because the Due Process Clause does not require the State to provide rescue services, it follows that we cannot interpret that clause so as to place an affirmative obligation on the State to provide competent rescue

services if it chooses to provide them." *Brown*, 318 F.3d at 478.

Thus, in order to "shock the conscience," rescue services must be more than incompetent. In fact, in light of our decision in *Ziccardi v. City of Philadelphia*, 288 F.3d 57 (3d Cir. 2002), shocking the conscience entails more even "than subjective deliberate indifference," *id*. at 65, the standard applied by the District Court in this case. Rather, plaintiffs must provide "proof of something less than knowledge that the harm was practically certain but more than knowledge that there was a substantial risk that the harm would occur." *Id*. at 66. In other words, the plaintiffs here must demonstrate that the EMTs "consciously disregarded, not just a substantial risk, but a *great risk* that serious harm would result" from their conduct. *Id*. (emphasis added).

On the facts of this case, I doubt very much that the plaintiffs will be able to demonstrate this added element of culpability. While the EMTs may have failed properly to assist Rivas, they certainly could not have expected, when they called for assistance in subduing a patient, that the police would subject the patient to physical abuse. Perhaps upon witnessing the subsequent mistreatment of their patient they should have intervened. Almost certainly they should have offered medical advice (*e.g.*, a patient experiencing a seizure should not be touched). But it would be a harsh burden to require an EMT to insert herself into a struggle between a seizing

patient and a violent police officer. It is after all a police officer, not an EMT, who is expected to carry out and enforce the law; an EMT will rarely feel qualified to second guess an officer's authority.

I nonetheless concur because it is not now our role to interpret the facts. We will reverse the District Court's denial of summary judgment only if there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(c). In assessing whether judgment as a matter of law is appropriate, we construe the facts in the light most favorable to the plaintiffs. We thus assume that the EMTs did not merely call the police unnecessarily because they misinterpreted Rivas's symptoms as potentially aggressive or because they were needlessly afraid. Rather, we assume that they actually and actively *misrepresented* to the police that Rivas had attacked them. Though the chances are remote, a jury theoretically could find that the EMTs, unwilling to dirty their hands to assist their patient, called the police in order purposefully to shirk their responsibility. Alternatively, it is conceivable that Garcia and Rodriguez needlessly phoned for backup in a moment of fear and became embarrassed when they arrived; perhaps they chose to justify their call with false allegations of violence rather than admit their hastiness.

I am skeptical that the EMTs acted in this manner, but the conflicting testimony identified by Judge Garth potentially could support such an interpretation. I agree that such conduct, however unlikely, would satisfy the high standard of culpability laid out in *Lewis* and *Brown*. I therefore leave for the jury the question whether Garcia and Rodriguez consciously disregarded a great risk of serious harm to Rivas in a manner that "shocks the conscience."

28