Matthew GREMO, Plaintiff,

v.

Samuel KARLIN, et al. Defendants,

No. Civ.A.04–CV–2497.

United States District Court,
E.D. Pennsylvania.

March 1, 2005.

Stephen W. Bruccoleri, Law Offices of Stephen W. Bruccoleri, Philadelphia, PA, for Plaintiff.

Jeffrey M. Scott, City of Philadelphia Law Dept. Div. Deputy City Solicitor, Philadelphia, PA, for Defendants.

## MEMORANDUM

ANITA B. BRODY, District Judge.

## I. INTRODUCTION

Plaintiff Matthew Gremo ("Gremo") brought this civil rights action against the City of Philadelphia and the School District of Philadelphia ("municipal defendants"), the City of Philadelphia Police Department and the City of Philadelphia Police Department Northeast Detective Division ("ancillary municipal defendants"), and the following individuals: Samuel Karlin, the Principal of George Washington High School; Mitchell S. Baron, Dr. Alvin Vaughn, and Karen Piscopo, Assistant Principals at George Washington High School; Eileen Archibald, a registered nurse for the George Washington High School; Bianca Stevens, Karen McHugh, Charles Unrath, Raymond Swift, Jim Galen, and Charles Veterano, school police officers for the George Washington High School; Orin Lutz, a school police investigator for the George Washington High School; Augustine Pescatore, a supervisor for the School District of Philadelphia; Dexter Green, the Executive Chief of Security for the School District of Philadelphia; Karen Hunter, a City of Philadelphia police officer; and Police Captain Hart, a City of Philadelphia police captain ("individual defendants"). (Am.Compl.¶¶ 2–21.) The amended complaint alleges both federal and state law claims. Defendants have filed motions to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

I will grant the motions to dismiss as to the federal claims for damages against the individual defendants and the state law claims for damages against the municipal defendants. However, I will deny the motions to dismiss with respect to the state law claims against the individual defendants and the federal claims against the municipal defendants. In other words, the federal claims will continue as to the municipal defendants, the City of Philadelphia and the School District of Philadelphia, and the claims against the individual defendants will continue as to the state law claims.

This court has jurisdiction pursuant to 28 U.S.C. § 1331 for the claims that arise under federal law and pendent jurisdiction pursuant to 28 U.S.C. § 1367(a) for the state law claims.

## II. BACKGROUND

The facts presented in this section are the facts alleged in the amended complaint.

### A. The Incident

The incident that precipitated this action occurred on November 13, 2001 in the George Washington High School in the School District of Philadelphia. (Am. Compl.¶¶ 20, 39.) The plaintiff, Gremo, was a senior honors student at George Washington High School. (Id. at ¶ 38.)

Gremo was in one of the school's common areas when a group of approximately fifteen students threw a garment over Gre-

mo's head and began repeatedly punching and kicking him. (*Id.* at ¶ 39.) The blows fell on his body, face, neck, and skull, and Gremo was left unconscious. (*Id.*) When he gained some consciousness, he was so severely injured that he could not walk, and others had to assist him to the nurse's office. (*Id.* at ¶ 40.) Gremo's face was discolored, his ears were red, and he had blood about his ear. (*Id.* at ¶ 42.)

When Gremo was ultimately taken to the hospital, he had to undergo cranial decompressive surgery for an epidural hematoma and a subdural hematoma in the vicinity of the left side of his brain. (*Id.* at ¶ 44.) He sustained massive scarring due to the surgery. (*Id.* at ¶ 48.) As a result of the attack, he is left with permanent brain damage. (*Id.* at ¶ 27.) In particular, he will have permanent loss of cognitive function and cognitive impairments, comprehension deficits and difficulties, continued lapse of short term memory, and the need for continued permanent medication. (*Id.* at ¶ 48.)

## B. The Legislative Report

Just over two years prior to the incident, the Pennsylvania House of Representatives authorized a legislative committee to investigate violence in the School District of Philadelphia. (Am.Compl.¶ 24.) The committee conducted the investigation and issued a report in the year 2000. The report made factual findings that corroborated the rampant, unabated, unfettered, ongoing violence within the School District of Philadelphia including the George Washington High School. (*Id.* at ¶ 25.) This report described the existence of the following practices and attitudes in the schools, including George Washington High School: a long-standing pattern of denial of violence in the school system on the part of the School District of Philadelphia; an implied threat of retribution against any teacher or administrator willing to come forward and tell the truth about the level of violence within the public schools; attempts by the School District of Philadelphia, school administrators, principals, teachers, and security personnel to conceal violent incidents and under-report the number of violent assaults that occurred throughout the school system for a period of over two years; and an attitude and atmosphere on the part of the School District of Philadelphia that a certain level of violence was accepted and acceptable within the schools in that district. (*Id.*) As a result of these practices and attitudes, there existed an atmosphere of violent chaos within the schools in the district that rendered them unsafe for the activities for which they were regularly used and intended. (*Id.*)

The report and its findings were communicated to the School District of Philadelphia with a mandate by the Pennsylvania House Urban Affairs Committee to immediately formulate and implement administrative procedures and disciplinary responses to abate the continued, unfettered violence. (*Id.* at ¶ 26.) After making assurances that it would comply, the School District of Philadelphia failed to follow that mandate even though it knew of the continued, brutal violence against innocent students. (*Id.*) This fostered continued brutal and violent criminal activities targeting innocent students.

## C. The Previous Incidents

In addition to the district-wide history of violence, there was also a specific history of violence in the George Washington High School relevant to the beating of Gremo. For over two years prior to the incident, a group of approximately fifteen George Washington High School students repeatedly targeted innocent students in known, unsecured, unmonitored common

areas of the George Washington High School. (Am.Compl.¶ 29.) These students would throw a garment over the victim's head and beat the victim. (*Id.* at ¶ 30.) Although the identity of these students and their method for beating victims were known to the school, there was no coordinated effort within, by or amongst the defendants to isolate the members of the group, discipline any members of the group, secure or monitor the common areas where the incidents of violence repeatedly occurred, memorialize the violent incidents accurately or routinely via medical records or security reports, report the repeated incidents to the Philadelphia Police Department or in-school Philadelphia police liaison, or make any concerted effort to halt the continued brutality within the school. (*Id.* at ¶ 34.) There was even an incident of violence against an innocent student by the group of approximately fifteen students earlier in the day on November 13, 2001, before the group attacked Gremo. (*Id.* at ¶ 39.) Due to the unfettered violence in the George Washington High School, students who were innocent victims of the beatings feared violent retribution and, therefore, refused to pursue criminal prosecution. (*Id.* at ¶ 50.)

On the rare occasion that a violent incident by the group of approximately fifteen students was reported in the two years prior to the beating of Gremo, the Philadelphia Police Department was not cooperative with the School District police in the investigation. (*Id.* at ¶ 35.) The Philadelphia Police Department did not take the reports of violence seriously, which resulted in continued violence in the schools. (*Id.* at ¶ 36.)

The following individual defendants were employed by the George Washington High School on November 13, 2001 and in the two years preceding that date: Samuel Karlin, Principal; Michael S. Baron, Assistant Principal; Dr. Alvin Vaughn, Assistant Principal; Karen Piscopo, Assistant Principal; and Eileen Archibald, Registered Nurse ("the School Nurse"). (*Id.* at ¶ 31.) The following individual defendants were involved with the George Washington High School during some portion of the two years prior to November 13, 2001 as School District of Philadelphia security police officers and/or investigators: Bianca Stevens, Karen McHugh, Charles Unrath, Raymond Swift, Jim Galen, Charles Veterano, and Orin Lutz. (*Id.* at ¶ 32.) Individual defendant Karen Hunter was employed during some portion of the two years prior to November 13, 2001 as the City of Philadelphia police officer on site at the George Washington High School. (*Id.*)

The following individual defendants were performing the duties of their respective offices for two years prior to and including November 13, 2001: Augustine Pescatore, Supervisor of the School District of Philadelphia; Dexter Green, Executive Chief of Security of the School District of Philadelphia; and City of Philadelphia Police Captain Hart. (*Id.* at ¶ 33.) In addition, the municipal defendants, the City of Philadelphia and the School District of Philadelphia, and the ancillary municipal defendants, the City of Philadelphia Police Department and the City of Philadelphia Police Department Northeast Detective Division, existed for the two years prior to and including November 13, 2001. (*Id.*)

## D. Defendants' Response to the Incident

After Gremo was beaten on November 13, 2001, some students helped carry or drag him to the school nursing office. (Am.Compl.¶ 40.) On the way to the nursing office, several police officers relieved the students assisting Gremo and brought Gremo to the nursing office. (*Id.* at ¶ 41.)

The School Nurse performed a cursory examination of Gremo without conducting a routine nursing vital assessment, calling 911, or summoning an ambulance. (*Id.* at ¶ 42.) The School Nurse maintained that Gremo was not injured and released him to his mother. (*Id.* at ¶ 43.) None of the defendants memorialized the attack in any form nor did they summon the Philadelphia Police. (*Id.* at ¶ 45.) A police investigation was not commenced until Gremo's mother notified the Philadelphia Police that her son was in the hospital with a brain bleed due to an attack by a group of students at school. (*Id.* at ¶ 46.) When this police investigation began, the George Washington High School authorities told the investigating officer that the Gremo matter was unfounded. (*Id.* at ¶ 47.)

The individual, municipal, and ancillary municipal defendants filed motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).[1] In their motions to dismiss, all defendants move to dismiss all federal and state claims.

## III. STANDARD OF REVIEW

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the legal sufficiency of the complaint. *Kost v. Kozakiewicz,* 1 F.3d 176, 183 (3d Cir.1993). In ruling on a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a court must "accept as true the factual allegations in the complaint and all reasonable inferences that

can be drawn therefrom." *Nami ·v. Fauver,* 82 F.3d 63, 65 (3d Cir.1996). Because the court must determine whether "under any reasonable reading of the pleadings, the plaintiff may be entitled to relief," a claim may be dismissed only "if it appears that the plaintiffs [can] prove no set of facts that would entitle them to relief." *Id.*

## IV. DISCUSSION

Gremo brings this action against defendants under 42 U.S.C. § 1983 for violating his substantive due process right to bodily integrity secured by the Fourth and Fourteenth Amendments to the United States Constitution, as well as for violating Pennsylvania case law, statutory law, and the Pennsylvania Constitution.[2]

■ At the outset, the ancillary municipal defendants, the City of Philadelphia Police Department and the City of Philadelphia Police Department Northeast Detective Division, must be dismissed as a matter of law because the police department and detective division are not legal entities separate from the City of Philadelphia. *Baldi v. City of Philadelphia,* 609 F.Supp. 162, 168 (E.D.Pa.1985). Suits against the police department must be made in the name of the City of Philadelphia:

no [department of the City of Philadelphia] shall be taken to have had, since the passage of the act to which this is a supplement, a separate corporate exis-

---

1. One motion to dismiss was filed by defendants the City of Philadelphia, Captain Hart, and Karen Hunter, and the other motion to dismiss was filed by defendants the School District of Philadelphia, Samuel Karlin, Mitchell S. Baron, Alvin Vaughn, Karen Piscopo, Eileen Archibald, Bianca Stevens, Karen McHugh, Charles Unrath, Raymond Swift, Jim Galen, Charles Veterano, Orin Lutz, Augustine Pescatore, and Dexter Green. Because there is sufficient overlap between the motions to dismiss, I will address the argu-

ments in the motions to dismiss without identifying which argument is from which motion.

2. *Plaintiff also brings claims under 42 U.S.C. §§ 1985, 1986, and 1988. Those claims, although not specifically addressed in the motions to dismiss, are subsumed under the analysis of 42 U.S.C. § 1983. The disposition of those claims follows the disposition of the claims brought pursuant to 42 U.S.C. § 1983.*

tence, and hereafter all suits growing out of their transactions ... shall be in the name of the city of Philadelphia. Pa. Stat. Ann. tit. 53, § 16257 (West 1998); *see also Baldi,* 609 F.Supp. at 168.

As for the claims against the remaining defendants, I will first address the individual defendants' qualified immunity defense to the section 1983 claims. I will then discuss municipal defendants' assertions that plaintiff failed to set forth sufficient allegations to hold the municipal defendants constitutionally liable under section 1983. Lastly, I will discuss the portions of the motions to dismiss addressed to the state claims.

## A. Qualified Immunity

■ All individual defendants assert the affirmative defense of qualified immunity as to the claims brought under 42 U.S.C. § 1983. The doctrine of qualified immunity provides that "government officials performing discretionary functions generally are granted a qualified immunity and are 'shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). To decide if an individual government official is entitled to qualified immunity, a court must first "determine whether the plaintiff has al-

leged the deprivation of an actual constitutional right at all." *Wilson,* 212 F.3d at 786 (citation omitted). If plaintiff has alleged such a deprivation, a court should thereafter "proceed to determine whether that right was clearly established at the time of the alleged violation." *Id.*[3] Following *Wilson,* I will first decide whether Gremo has alleged the deprivation of a constitutional right. If he has, I will determine whether that right was clearly established at the time the individual defendants allegedly violated that right.

## 1. Deprivation of a Constitutional Right

■ Under section 1983, a plaintiff must establish a deprivation of a constitutional right and that the constitutional deprivation was caused by a person acting under the color of state law.[4] *Kneipp v. Tedder,* 95 F.3d 1199, 1204 (3d Cir.1996). In the present case, Gremo alleges a deprivation of his right to bodily integrity under the Fourteenth Amendment to the Constitution.[5] Individuals have a constitutional liberty interest in personal bodily integrity that is protected by the Due Process Clause of the Fourteenth Amendment. *D.R. v. Middle Bucks Area Vocational Technical School,* 972 F.2d 1364, 1368 (3d Cir.1992) (citing *Ingraham v. Wright,* 430 U.S. 651, 672–74, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977)). The individual defendants maintain that they cannot be held responsible under the applicable case law for

---

**3.** Although it is important to resolve qualified immunity questions at the earliest possible stages of litigation, the importance of resolving qualified immunity questions early "is in tension with the reality that factual disputes often need to be resolved before determining whether defendant's conduct violated a clearly established constitutional right." *Curley v. Klem,* 298 F.3d 271, 277–78 (3d Cir.2002). A decision as to qualified immunity is "premature when there are unresolved disputes of

historical facts relevant to the immunity analysis." *Id.* at 278.

**4.** The individual defendants do not dispute that their actions were under the color of state law.

**5.** Plaintiff also alleges a violation of the Fourth Amendment, but provides no support for such an allegation.

depriving Gremo of this constitutional right.

In general, the State has no affirmative duty to protect its citizens from the violent acts of private individuals. *See, e.g., DeShaney v. Winnebago County Dep't of Soc. Serv.,* 489 U.S. 189, 195–96, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). The courts have recognized, however, certain instances in which the Due Process Clause of the Fourteenth Amendment imposes upon the State "an affirmative duty to protect an individual against private violence." *Kneipp,* 95 F.3d at 1204–05. Persons acting under color of state law have an affirmative duty to protect an individual against violence by a third party (1) if there is a "special relationship" between a person and the state, or (2) if there is a "state created danger." *Kneipp,* 95 F.3d at 1204–05; *see also Brown v. Commonwealth of Pennsylvania Dep't of Health Emergency Med. Serv. Training Inst.,* 318 F.3d 473, 478 (3d Cir.2003) (explaining that the two exceptions to the general rule of non-liability are the "special relationship" and "state-created danger" exceptions).

### (a) Special Relationship

The "special relationship" basis for a substantive due process violation provides that if the state has taken a person into its custody and is holding that person against his or her will, the state has formed a special relationship that imposes "affirmative duties of care and protection on the state." *Kneipp,* 95 F.3d at 1204. The special relationship may be created by "the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty," because that act deprives the plaintiff of liberty under the Due Process Clause. *DeShaney,* 489 U.S. at 200, 109 S.Ct. 998.

The Third Circuit considered whether compulsory schooling was a similar restraint of personal liberty in *D.R. v. Middle Bucks Area Vocational Technical School,* 972 F.2d 1364, 1369 (3d Cir.1992) (in banc). The plaintiffs argued in that case that the compulsory attendance laws and the *in loco parentis* status of the school employees placed the plaintiffs in custody during the school day, which established a special relationship such that section 1983 liability was available. *Id.* at 1370. The court rejected this argument and explained that the state must have exclusive physical custody in order to establish a special relationship with an individual. *Id.* at 1370–71. The court in *D.R.* held that parents remain the primary caretakers of the students and that there is not sufficient restraint on students' personal liberty to constitute a special relationship for purposes of the Due Process Clause. *Id.* at 1371–72. The holding in *D.R.* that schools and students do not have a special relationship for purposes of the Due Process Clause continues to be binding in the Third Circuit. *See Nicini v. Morra,* 212 F.3d 798, 807–08 (3d Cir.2000).

Therefore, plaintiff has failed to make allegations sufficient to demonstrate a special relationship for purposes of the Due Process Clause.

### (b) State–Created Danger

The rule that the state has no responsibility to protect its citizens from the violent acts of private parties finds a second exception when a state actor creates a danger that harms an individual or renders him or her more vulnerable to that danger. The "state-created danger" basis for liability was originally drawn from the language in the Supreme Court decision in *DeShaney v. Winnebago County Dep't of Social Serv.,* 489 U.S. at 201, and was specifically adopted by the Third Circuit in

*Kneipp v. Tedder,* 95 F.3d at 1199. The Third Circuit established a four-part test to determine whether there existed a state-created danger such that a state actor should be held constitutionally liable for injuries to a plaintiff. Liability attaches if the following four prongs are satisfied:

> (1) the harm ultimately caused was foreseeable and fairly direct; (2) the state actor acted in willful disregard for the safety of the plaintiff; (3) there existed some relationship between the state and the plaintiff; [and] (4) the state actors used their authority to create an opportunity that otherwise would not have existed for the third party's crime to occur.

*Kneipp,* 95 F.3d at 1208 (citing *Mark v. Borough of Hatboro,* 51 F.3d 1137, 1152 (3d Cir.1995)).

*(i) Harm Was Foreseeable and Fairly Direct*

In addressing the first prong of the state-created danger test, whether the harm was foreseeable and fairly direct, a court must initially decide whether the harm was foreseeable. Any discussion of foreseeability is fact intensive and requires a study of the facts that were determinative as to that issue in precedential cases.

In 1992, the Third Circuit decided *D.R.,* 972 F.2d 1364.[6] *D.R.* involved allegations that several male students forced plaintiffs, two female students, into a darkroom or unisex bathroom and sexually molested them multiple times a week for approximately five months. *D.R.,* 972 F.2d at 1366. The unisex bathroom and darkroom were part of the classroom to which the students had been assigned. *Id.* Plaintiffs

did not claim to have told the teacher about the incidents. *Id.* Plaintiffs claimed that the teacher either was in the classroom or should have been in the classroom while the incidents occurred and did or should have heard the incidents taking place. *Id.* Although plaintiffs did not allege that the students' teacher observed those incidents, they did allege that she observed frequent misconduct by the male students in the classroom, including obscene language and gestures, and offensive physical touching of females in the classroom. *Id.* The teacher took no action in response to the observed misconduct. *Id.* In addition, one of the plaintiffs told the Assistant Director of the school that one male student was trying to force her into the bathroom for the purpose of engaging in sexual conduct, but the Assistant Director took no action. *Id.* Other school administrators knew of the non-sexual misconduct occurring in the classroom and took no action. *Id.* The Third Circuit in *D.R.* ruled that the school defendants' failure to report, investigate, and address the incidents in which the male students molested plaintiffs in the bathroom and the darkroom did not establish a state-created danger. *Id.* at 1373–76.

In 1996, the Third Circuit decided *Kneipp,* 95 F.3d 1199.[7] In *Kneipp,* the police had stopped a man and a woman because they were causing a disturbance. *Kneipp,* 95 F.3d at 1201. They sent the man home, but detained the woman, who was highly intoxicated. *Id.* at 1202. The police then sent the woman home by herself and she was later found unconscious at the bottom of an embankment suffering from hypothermia, which caused her per-

---

6. The Third Circuit in *D.R.* reviewed the district court's decision to grant defendants' motions to dismiss. *D.R.,* 972 F.2d at 1367.

7. The Third Circuit in *Kneipp* reviewed the district court's decision to grant defendants' motion for summary judgment. *Kneipp,* 95 F.3d at 1204.

manent brain damage. *Id.* at 1202–03. The Third Circuit in *Kneipp* held that the injuries to the woman were foreseeable because it was clear that her ability to walk was impaired, and a reasonable trier of fact could conclude that "she would be more likely to fall and injure herself if left unescorted than someone who was not inebriated." *Id.* at 1208.

In 1997, the Third Circuit decided *Morse v. Lower Merion School District,* 132 F.3d 902 (3d Cir.1997).[8] In *Morse,* private contractors were working on construction projects in a school building, and the contractors routinely propped open the back door to the building. *Morse,* 132 F.3d at 904. The school had a policy that all side and back entrances to the school were to be kept locked at all times. *Id.* However, the school district unlocked the rear door for the contractors and permitted the contractors to access the school through the unlocked rear entrance. *Id.* at 909, 914. A local resident with a history of mental illness entered the building and shot and killed a teacher. *Id.* at 904. The school was aware of previous unrelated incidents where trespassers had entered the building and stolen, vandalized, and, in one case, assaulted someone. *Id.* The Third Circuit held that the school district and other defendants "as a matter of law, could not have foreseen that allowing construction workers to use an unlocked back entrance for access to the school building would result in the murderous act of a mentally unstable third party." *Id.* at 908. The harm was too attenuated because the only notice to defendants that the harm might occur was that the woman who ultimately shot the teacher had been seen loitering in the school and school area

during the preceding week. *Id.* The plaintiff did not allege that defendants knew of the perpetrator's violent propensities. *Id.* Nor did the plaintiff allege that there were previous occasions when a person with a history of mental illness had entered the school building. *Id.* Therefore, the harm was too attenuated from the act of leaving the door propped open to be a "fairly direct" result. *Id.* at 908–09.

Most recently, in 2004, the Third Circuit decided *Rivas v. City of Passaic,* 365 F.3d 181, 194 (3d Cir.2004).[9] In *Rivas,* two emergency medical technicians were called to help a man who was having or had just experienced a seizure. *Rivas,* 365 F.3d at 194. They knew from their training that a seizure victim should not be restrained, even when the convulsions appear to be over. *Id.* Shortly after arriving, they called for police backup but failed to inform the police about the seizures or warn the police that the seizure victim should not be restrained. *Id.* The police engaged in a physical struggle with the seizure victim and the seizure victim died. *Id.* at 186–88. The court held in *Rivas* that his death was a foreseeable and fairly direct result of the emergency medical technicians' failure to instruct them about the medically fragile nature of the seizure victim. *Id.* at 195.

██ Under Third Circuit jurisprudence, a harm is foreseeable when a state actor has actual awareness, based on concrete information, of a risk of harm to an individual or class of individuals such that the actor is on notice that his or her act or failure to act significantly enhances that risk of harm. The court in *Morse* quoted a Fifth Circuit case that articulated a simi-

---

8. The Third Circuit in *Morse* reviewed the district court's decision to grant defendants' motion to dismiss. *Morse,* 132 F.3d at 903.

9. The Third Circuit in *Rivas* reviewed the district court's decision to deny defendants' motions for summary judgment. *Rivas,* 365 F.3d at 184.

lar requirement of foreseeability: "[a]ctual knowledge of a serious risk of physical danger to the plaintiff has been a common feature of the state-created danger cases." *Morse*, 132 F.3d at 911 (quoting *Johnson v. Dallas Indep. Sch. Dist.*, 38 F.3d 198, 201 (5th Cir.1994) *cert. denied*, 514 U.S. 1017, 115 S.Ct. 1361, 131 L.Ed.2d 218 (1995)). The Fifth Circuit explained that there was no state-created danger in that case because, based on the pleadings, "no legitimate inference [could] be drawn that the school officials might have been actually aware of a high risk that an armed *non-student* invader would enter the campus and fire a pistol randomly during school hours." *Johnson*, 38 F.3d at 201–02 (italics in original), *quoted in Morse*, 132 F.3d at 911. As in *Johnson*, the Third Circuit requires a level of awareness on the part of the state actors that rises to the level of actual knowledge or an awareness of risk that is sufficiently concrete to put the actors on notice of the harm.

In *Kneipp*, for example, when the police officer left the intoxicated woman outside alone late at night, ordinary common sense and experience, in this instance attributed to the officer, sufficiently informed the officer of the risk of harm to the woman. This concrete information put him on notice that his action significantly enhanced the risk of harm to the woman. Thus, the court concluded that the harm incurred by the woman in *Kneipp* was foreseeable.

In *Rivas*, the state actors were emergency medical technicians. Their expertise as emergency medical technicians equipped them with concrete information that a seizure victim should not be restrained. The information that they had was sufficiently concrete to put them on notice of the harm that could result if they failed to impart that information to the police officers who arrived on the scene to assist the emergency medical technicians

with the seizure victim. The Third Circuit concluded that, in the context of a state-created danger claim, the harm to the seizure victim was foreseeable.

In *Morse*, there was no allegation that the school district had sufficiently concrete information about the risk of violence presented by the perpetrator or other trespassers on school property to put the school district on notice of the harm that might result from the propped-open door. Therefore, when the school district employees, against their own regulations, unlocked the door for the contractors to work, and the perpetrator of the violent incident entered through that open door, the court held that the school district lacked sufficiently concrete information to consider its action a foreseeable cause of the harm to the teacher who was shot. As the court explained, the harm was "too attenuated" because the only notice to the school district that the harm might occur was that the person who ultimately shot the teacher had been loitering in the hallways the week before the killing. *Morse*, 132 F.3d at 908–09. Knowledge of someone loitering, in and of itself, did not provide defendants with notice of a risk of violence.

The facts of the underlying incident in *D.R.*, which also occurred in a school setting, were closer to the facts in the present case. Initially, it should be noted that the decision in *D.R.* predated the Third Circuit's clear adoption of the state-created danger basis for liability in *Kneipp*. The contours of the doctrine were not addressed by the court at the time of its decision in *D.R.* When *D.R.* is read in conjunction with *Kneipp*, *Rivas*, and *Morse*, the analysis of foreseeability in *D.R.* is clarified. The defendants in *D.R.* simply did not have sufficiently concrete information about the previous incidents to place them on notice that a failure to act

would foreseeably place the plaintiffs, two female students, at risk of the sexual misconduct that occurred. Although the male students had forced the plaintiffs into secluded places to sexually molest them multiple times a week for about five months, the plaintiffs did not claim that the teacher saw the incidents, only that she either heard or should have heard the incidents taking place and that she observed frequent misconduct of a non-sexual nature in the classroom. Plaintiffs claimed that the assistant director was told that a male student was trying to force one of the plaintiffs into the bathroom for the purpose of engaging in sexual conduct, which provided the assistant director with knowledge of an uncorroborated accusation of an attempted molestation. A student's uncorroborated accusation of an attempted molestation does not rise to the level of actual awareness of the risk sufficient to hold the school defendants constitutionally liable.

■■■ The Third Circuit decisions as to foreseeability in state-created danger cases lead to the conclusion that the harm to Gremo in the present case was foreseeable or at least that Gremo might prove a set of facts showing foreseeability. The state actors had actual awareness based on concrete information that was sufficient to amount to notice that the individual defendants' omissions and commissions would enhance the risk of harm to Gremo. For two years leading up to the attack, there was a group of approximately fifteen students who were known to attack students in unmonitored common areas by throwing a garment over the head of the victim and beating the victim. Unlike the school defendants in *D.R.*, all individual defendants in the present case were alleged to have been aware of the repeated attacks. In *D.R.*, plaintiffs alleged that one school administrator was told about *one attempted attack* in which a male student was trying to force one of the plaintiffs into a bathroom for the purpose of engaging in sexual conduct, but in the present case, Gremo alleged that all the defendants were aware of *repeated actual attacks* that had already occurred. The plaintiffs in *D.R.* also alleged that the teacher in the classroom either heard or should have heard the incidents taking place in the bathroom and darkroom, but even if the teacher heard some of what took place in the bathroom, there is no indication that she knew the extent, character, or frequency of the molesting. In contrast, Gremo alleged that the defendants in the present case knew of violent incidents by the same group of students that repeatedly occurred in the same manner, and in the same locations. Additionally, it is reasonable to infer from the allegations in the present case that some of the individual defendants were aware of the legislative committee report that made factual findings describing an attitude that a certain level of violence was acceptable in the schools, a longstanding pattern of denial of and concealment of violence in the school system, and an implied threat of retribution against teachers or administrators willing to come forward and tell the truth about the level of violence in the school system. There was no such report mentioned in *D.R.* According to the allegations, the school defendants in *D.R.* not only had less notice of the events that were occurring than the defendants in the present case, they also acted less reprehensibly in response to the notice. The school defendants in *D.R.* failed to investigate; in the present case, the defendants actively concealed information about the violent attacks in addition to failing to address the acts of violence.

The language of the holding in *D.R.* could be read to indicate that the court relied in part on the distinction between affirmative actions and omissions. *D.R.*, 972 F.2d at 1374. *D.R.* distinguished two

cases decided by other circuit courts in which the state actors were held liable under the state-created danger theory, *Wood v. Ostrander,* 879 F.2d 583 (9th Cir. 1989) and *Cornelius v. Town of Highland Lake,* 880 F.2d 348 (11th Cir.1989), because in each of those cases "the state can fairly be said to have affirmatively acted to create the danger to the victims." *D.R.* 972 F.2d at 1373–74. The facts of those cases were summarized in *D.R.* as follows:

In *Wood,* the police officer arrested an intoxicated driver and impounded the vehicle leaving the driver's female passenger in a neighborhood known for criminal activity at night without any means to travel to a place of safety. The woman was raped by a stranger who offered to take her home. In *Cornelius,* the state prison officials and local officers instituted a prisoner work program which permitted inmates to work in public areas with access to dangerous weapons under the general supervision of an untrained city employee. Although the authorities represented to the public that only property offenders would be assigned to the work crews, the state permitted a prisoner with a violent criminal history to work in the town hall where plaintiff was employed. This prisoner abducted plaintiff at knifepoint and held her hostage for three days, subjecting her to repeated threats of physical and sexual abuse.

*Id.* at 1374. Because it characterized the relevant decisions by state actors in those cases as "affirmative acts," *D.R.* analyzed the foreseeability and causation of the harm in the case before it by discussing only the school defendants' acts that it considered "affirmative actions," which generally included assigning a student teacher to that particular class, failing to supervise her more closely, and failing to control the non-sexual disruption in the classroom. *Id.* The Third Circuit in

*Morse* clarified *D.R.* in this regard. *Morse* explained that whether defendants' influence is properly characterized as an affirmative act or an omission is not determinative; rather, the relevant inquiry is "whether the state has in some way placed the plaintiff in a dangerous position that was foreseeable." *Morse,* 132 F.3d at 915. Therefore, while the court in *D.R.* did not believe that failure to control the general non-sexual misconduct in the class placed plaintiffs at a greater risk of sexual misconduct in bathrooms or darkrooms such that it was foreseeable that they would be molested, in the present case, the acts of the defendants in covering up the incidents of violence and failing to address the danger placed Gremo and other students at a greater risk of similar incidents such that it was foreseeable they would be attacked by the group of known students in the unmonitored common areas. Therefore, the amended complaint in the present case alleges sufficient information to meet the standard for foreseeability in the state-created danger context.

██ Once the foreseeability hurdle in the first prong of the analysis on state-created danger has been met, the complaint must also allege that the attack is a fairly direct result of defendants' acts. At this stage of the litigation, the attack on Gremo can be said to be a "fairly direct" result of defendants' acts of ignoring, concealing, and failing to address the violent attacks by the group of approximately fifteen students. Far from being an unrelated intervening third party as in *Morse,* the group of students were part of the school community and were influenced by the school's policies and actions. It is reasonable to infer from the amended complaint that the fifteen students in this case were encouraged by the defendants' concealment and under-reporting of the violent assaults. Defendants' acts and omissions

also may have made conditions in the school more conducive to the attacks. Unlike in *D.R.*, the assaults by the group of approximately fifteen students were in common areas and were, in essence, public events. Therefore, the defendants' decision to conceal the attacks may have been perceived as an implicit condonation and likely had a greater impact on the perpetrators than the school defendants' actions in *D.R.* In addition, the allegations in the present case indicate that most of the individual defendants persistently left common areas unmonitored with the knowledge that violent attacks were repeatedly occurring in those areas. That sends a very strong message that can reasonably be inferred to have encouraged the group of students in their attacks. For purposes of the motions to dismiss, plaintiff has successfully demonstrated that the harm may have been foreseeable and a "fairly direct" result of defendants' actions.

*(ii) State Actor Acted in Willful Disregard*

▇▇▇▇▇ In addressing the second prong of the state-created danger analysis, a court must decide whether the individual defendants acted in willful disregard for the safety of the plaintiff. In *Morse*, the Third Circuit defined the required mental state as either "willful disregard for" or "deliberate indifference to" the safety of the plaintiff. *Morse*, 132 F.3d at 910 (citing *Kneipp*, 95 F.3d at 1208 n. 21). Under this standard, the danger must have been foreseeable to the state actors and "the state's actions must evince a willingness to ignore" that foreseeable risk of danger. *Id.* The Supreme Court explained in *County of Sacramento v. Lewis* that for purposes of a substantive due process violation, abusive executive actions must abuse power to the extent that it "shocks the conscience" in order for it to be "arbitrary in the constitutional sense." *County of*

*Sacramento v. Lewis*, 523 U.S. 833, 846, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (citation omitted). It further explained that a showing of "deliberate indifference" by executive actors may also be sufficient to demonstrate a violation of substantive due process because "[d]eliberate indifference that shocks in one environment may not be so patently egregious in another." *Id.* at 850, 118 S.Ct. 1708. The Court further held that the "deliberate indifference" standard is limited to those instances "when actual deliberation is practical." *Id.* at 851, 118 S.Ct. 1708. The Third Circuit in *Rivas*, following *County of Sacramento v. Lewis*, explained that "deliberate indifference" is not sufficient to shock the conscience in situations requiring the state actors to act with some urgency, such as a police chase or a response by emergency medical personnel. *Rivas*, 365 F.3d at 195–96. In a situation where the state actors have "the luxury of acting in a deliberate manner," however, *Kneipp* remains good law and the "deliberate indifference" standard applies to actions in non-emergency circumstances. *Id.* at 195.

In the present case, Gremo alleged that the group of students had been attacking innocent victims for over two years, so the defendants may well have had two years to act to address the repeated attacks by the group of approximately fifteen students. In addition, it is reasonable to infer from the allegations in the amended complaint that at least some defendants learned of the legislative committee report in time to formulate and implement administrative procedures and disciplinary responses. The danger that the defendants are alleged to have created is not one that had to be addressed with the urgency involved in a police chase or emergency medical response. Therefore, the "shocks the conscience" standard is met when defendants have acted with "deliberate indifference."

Under the facts in the amended complaint, the individual defendants could have foreseen the danger (*see* discussion *supra*), therefore, the question outstanding is whether the individual defendants were deliberately indifferent to that danger. If the allegations in the amended complaint are accepted as true and reasonable inferences are drawn from those allegations, the defendants who foresaw the danger of continued attacks by the group of students were acting with deliberate indifference when they concealed the attacks and failed to address the unmonitored common areas that were commonly the sites of the attacks.

### (iii) There Existed Some Relationship between State and Plaintiff

 In addressing the third prong of the state-created danger analysis, a court must determine whether there existed some relationship between the state and the plaintiff. This "relationship" element of the state-created danger basis for alleging a constitutional violation does not require the same showing as the "special relationship" basis for constitutional liability. *Morse*, 132 F.3d at 912. Under the state-created danger basis for alleging a constitutional violation, the relationship requirement "contemplates some contact such that the plaintiff was a foreseeable victim of the defendant's acts in a tort sense." *Id.* (quoting *Kneipp*, 95 F.3d at 1209 n. 22). Although the plaintiff is not a foreseeable victim if the state actors create a threat to the general population only, the threat does not have to be against a specific individual. *Morse*, 132 F.3d at 913. Rather, the Third Circuit in *Morse* acknowledged that there was a relationship between the state and the plaintiff under a state-created danger theory "if the plaintiff was a member of a discrete class of persons subjected to the potential harm brought about by the state's actions." *Id.* See also *Rivas*, 365 F.3d at 197.

In the present case Gremo was a member of a discrete class of persons, students at George Washington High School, subjected to potential harm brought about by the state's actions. The group of approximately fifteen students were not a threat to the population at large, but only to that class of persons. Therefore, there was a relationship between plaintiff and the state for purposes of the state-created danger theory.

### (iv) State Actors Used Authority to Create Opportunity for Crime

 In addressing the fourth and final prong of the state-created danger analysis, a court must decide whether the individual defendants used their authority to create an opportunity that otherwise would not have existed for the third parties' crime to occur. Whether defendants' influence is properly characterized as an affirmative act or an omission is not determinative. *Morse*, 132 F.3d at 915. The dispositive consideration, as stated in *Morse*, is "whether the state has in some way placed the plaintiff in a dangerous position that was foreseeable." *Id.* at 915. In *Kneipp*, the court held that the defendants "used their authority ... to create a dangerous situation or to make [plaintiff] more vulnerable to danger had [the defendants] not intervened." *Kneipp*, 95 F.3d at 1209. In the present case, the failure of some of the defendants to take appropriate steps to address the violence and monitor unsafe common areas placed Gremo in a more dangerous position. Also, the acts of concealment by all defendants made Gremo more vulnerable to the danger of attack, because those acts could have had the effect of encouraging the perpetrators.

In *D.R.*, the court held that there was no causal connection sufficient to hold the

school constitutionally liable because "[p]laintiffs' harm came about solely through the acts of private persons without the level of intermingling of state conduct with private violence that supported liability [in other cases]." *D.R.*, 972 F.2d at 1375, *quoted in Morse*, 132 F.3d at 915. In the present case, the state conduct was substantially intermingled with the private violence. In *D.R.*, the school administrators simply failed to investigate one report of an attempted attack, and school defendants failed to ensure that there was discipline generally in the classroom. On the other hand, Gremo asserts that the defendants concealed reports of actual attacks and injuries, failed to report the attacks and injuries, and failed to address the attacks and injuries. Also, in the present case, some of the individual defendants actually saw the wounded victims, and all of the individual defendants knew that the attacks actually occurred. Some defendants read the legislative committee report concerning the widespread violence and concealment of violence. In fact, the knowledge of violence in the school was so widespread as to create an atmosphere that made a certain level of violence acceptable. The defendants' failure to act in these circumstances may have informed the perpetrators that, even though the defendants knew of the violent incidents, they would not interfere. This was bolstered by the fact that the defendants not only ignored the concrete information they received about the attacks, but also tried to conceal that information. It might be argued from the facts in the amended complaint that the net effect was that the perpetrators were confident in their ability to continue their attacks in the open. Considering the totality of the circumstances, the amended complaint alleges sufficient information to conclude that the state actors used their authority to create an opportunity that otherwise would not have existed for the third parties' crime to occur.

■ Based on the allegations in Gremo's amended complaint and reasonable inferences drawn from those allegations, Gremo may well be able to prove facts that would satisfy the four prongs of the state-created danger analysis. Therefore, Gremo has alleged the deprivation of an actual constitutional right, the substantive due process right to bodily integrity under the Fourteenth Amendment.

## 2. Clearly Established Right

■ Qualified immunity protects government officials from civil claims for damages unless there is a deprivation of an actual constitutional right and "that right was clearly established at the time of the alleged violation." *Wilson*, 212 F.3d at 786 (citation omitted). If the plaintiff has alleged the deprivation of an actual constitutional right, as Gremo has, the court must determine whether the right was clearly established at the time of the alleged violation. This second step in the qualified immunity analysis, is required because the purpose of qualified immunity is to "to ensure that before they are subjected to suit, [government officials] are on notice their conduct is unlawful." *Hope v. Pelzer*, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (quoting *Saucier v. Katz*, 533 U.S. 194, 206, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)).

■ The inquiry as to whether a constitutional deprivation was clearly established generally "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Curley v. Klem*, 298 F.3d 271, 277 (3d Cir. 2002) (quoting *Saucier*, 533 U.S. 194, 121 S.Ct. 2151). This requirement does not mean that "the very action in question has previously been held unlawful," rather "in

the light of pre-existing law the unlawfulness must be apparent." *Hope*, 536 U.S. at 739, 122 S.Ct. 2508 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). Thus, the state of the law must give defendants "fair warning that their treatment of [the plaintiff] was unconstitutional." *Id.* A constitutional right is established if it is sufficiently clear and well-defined so that "a reasonable official would understand that what he is doing violates that right." *Carswell v. Borough of Homestead*, 381 F.3d 235, 242 (3d Cir.2004) (citations omitted). Even if a reasonable state actor would so understand, the defendant may still be shielded from liability if he or she made a reasonable mistake as to what the law requires. *Id.*

As of November 13, 2001, the state of the law as to the state-created danger basis for constitutional liability, which is the only viable basis in the present case, did not give the individual defendants fair warning that their treatment of Gremo was unconstitutional. A reasonable state actor in the position of the individual defendants in the present case could have reasonably believed that his or her actions and omissions would not violate a constitutional right. Without a close analysis of *D.R.*, *Kneipp*, and *Morse*, as set forth in this opinion, a reasonable state actor could have understood the collective holding to be that state actors would not be constitutionally liable under the facts of the present case. Their understanding could reasonably be gleaned from the facts in *D.R.*, because the underlying incident in the present case occurred in a school, and the perpetrators who physically attacked Gremo were other students. As with the school defendants in *D.R.*, the defendants in the present case were neither the attackers nor were they alleged to have witnessed the actual attack. *D.R.*, which has not been overruled, held that the actions of the school defendants in that case did not result in a state-created danger and, therefore, the school defendants did not violate the plaintiffs' constitutional rights.

Therefore, although individual defendants in the present case would be constitutionally liable for a state-created danger, they are entitled to qualified immunity. The motions to dismiss of the individual defendants are granted as to the federal claims for damages.

**B. Federal Claims against Municipal Defendants**

 The municipal defendants, the City of Philadelphia and the School District of Philadelphia, have also moved to dismiss the federal claims for damages based on the contention that plaintiff failed to set forth sufficient allegations to hold the municipal defendants constitutionally liable. Municipalities and other local governmental entities can be sued and held constitutionally liable pursuant to 42 U.S.C. § 1983. *Marran v. Marran*, 376 F.3d 143, 155–56 (3d Cir.2004) (citing *Monell v. New York City Dept. of Social Serv.*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). A governmental entity cannot, however, be held constitutionally liable based on the doctrine of *respondeat superior* or vicarious liability. *A.M. v. Luzerne County Juvenile Detention Center*, 372 F.3d 572, 580 (3d Cir.2004) (citing *Monell*, 436 U.S. at 691–92, 98 S.Ct. 2018); *see also Collins v. City of Harker Heights, Texas*, 503 U.S. 115, 120–21, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992). When a claim is asserted against a municipality under 42 U.S.C. § 1983, the court must determine not only "whether plaintiff's harm was caused by a constitutional violation," but also "if so, whether the city is responsible for that violation." *Collins*, 503 U.S. at 120, 112 S.Ct. 1061 (citations omitted). In the present case, I have de-

termined that the plaintiff's harm was caused by a constitutional violation, and, therefore, the remaining question is whether the municipal defendants can be held responsible for that violation on some basis other than vicarious liability.

■■■ The city or a governmental entity can be held responsible for a constitutional violation if the plaintiff can "identify a policy or custom of the entity that caused the constitutional violation." *A.M.*, 372 F.3d at 580. In order for the governmental entity to be responsible for a policy, that policy must be "officially adopted and promulgated by that body's officers" or made "by those whose edicts or acts may fairly be said to represent official policy." *Monell,* 436 U.S. at 690–91, 694, 98 S.Ct. 2018, *quoted in Collins,* 503 U.S. at 121, 112 S.Ct. 1061. A custom that has not been formally approved may nevertheless "fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." *Board of the County Comm'r of Bryan County, Oklahoma v. Brown,* 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (citations omitted). There must also be a "direct causal link" between such policy or custom and the constitutional injury. *Carswell v. Borough of Homestead,* 381 F.3d 235, 244 (3d Cir.2004) (citations omitted).

■■■ In the present case, plaintiff has sufficiently alleged that Gremo's harm was caused by a constitutional violation and that the municipal defendants, the City of Philadelphia and the School District of Philadelphia, may be held responsible for that constitutional violation because of their policies and/or customs. The municipal defendants' policies and/or customs al-

leged in the amended complaint included concealing information about violence, failing to address safety concerns, failing to train employees to avoid violations of constitutional rights, and cultivating an atmosphere where employees of the municipal defendants would fail to report incidents of violence. Gremo has satisfactorily stated a claim that defendants the City of Philadelphia and the School District of Philadelphia can be held constitutionally liable under 42 U.S.C. § 1983 for violating plaintiff's substantive due process right to bodily integrity secured by the Fourteenth Amendments to the United States Constitution. Therefore, defendants' motions to dismiss the claims against the municipal defendants for violations of the Constitution under 42 U.S.C. § 1983 are denied. However, the Motion to Dismiss of School District of Philadelphia Defendants as to federal claims for punitive damages against defendant the School District of Philadelphia is granted.[10]

## C. State Claims

In addition to bringing federal claims under 42 U.S.C. § 1983, Gremo claims that his rights were violated under the Pennsylvania Constitution and under the Pennsylvania Political Subdivision Tort Claims Act ("Tort Claims Act"), 42 Pa. Cons.Stat. Ann. §§ 8542 & 8550. He alleges state-law claims of negligence and willful misconduct. Defendants argue that they are immune from plaintiff's state law claims under the Tort Claims Act, 42 Pa. Cons. Stat. Ann. §§ 8541–8564 (1998).

In general, the Tort Claims Act provides immunity to the municipality and its agencies and employees. It provides, *inter alia,* "no local agency shall be liable for any damages on account of any injury to a

---

**10.** Municipalities can be held liable for compensatory damages, but not punitive damages under section 1983. *City of Newport v. Fact*

*Concerts, Inc.,* 453 U.S. 247, 271, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981).

person or property caused by any act of the local agency or an employee thereof or any other person." 42 Pa. Cons.Stat. Ann. § 8541. Subject to certain exceptions, the immunity that the Tort Claims Act provides to the City of Philadelphia extends to employees of the City of Philadelphia insofar as the employees are subject to civil damages arising out of an "injury to a person or property caused by acts of the employee which are within the scope of his office or duties." 42 Pa. Cons.Stat. Ann. § 8545. The Third Circuit has interpreted the Tort Claims Act to provide immunity from claims for monetary damages even if the claims are brought under the Pennsylvania Constitution. *Sameric Corp. of Delaware v. City of Philadelphia*, 142 F.3d 582, 600 (3d Cir.1998); *cf. Jones v. City of Philadelphia*, 68 Pa. D & C.4th 47, 75–76 (Pa.Com.Pl.2004) (discussing in detail why the Tort Claims Act does not apply to claims brought under the Pennsylvania Constitution, and qualifying the language of *Sameric* as dicta).

 Under the Tort Claims Act, the City of Philadelphia and its agencies are excepted from this general immunity if both of the following conditions are met:

(1) damages would be recoverable at common law or under a statute creating a cause of action if the injury were caused by a person not protected by immunity, and (2) the claim falls within one of the statutory exceptions to governmental immunity in Section 8542(b) of the [Tort Claims] Act.

*Granchi v. Borough of North Braddock*, 810 A.2d 747, 749 (Pa.Comwlth.2002). Local agencies may be liable for acts related to the following categories listed in section 8542(b): (1) vehicle liability, (2) care, cus-

tody or control of personal property, (3) real property, (4) trees, traffic controls and street lighting, (5) utility service facilities, (6) streets, (7) sidewalks, and (8) care custody or control of animals. 42 Pa. Cons. Stat. Ann. § 8542(b). Neither the municipal defendants nor the individual defendants in the present case are excepted from immunity under any of these eight categories.[11]

 There is an additional exception to the immunity provided under the Tort Claims Act for employees in actions "for damages on account of an injury caused by the act of the employee in which it is judicially determined that the act of the employee caused the injury and that such act constituted a crime, actual fraud, actual malice, or willful misconduct." 42 Pa. Cons.Stat. Ann. § 8550. In determining when the "willful misconduct" exception provided in section 8550 applies, a Pennsylvania Commonwealth Court originally defined the term "willful misconduct" as being synonymous with the term "intentional tort" and as meaning "conduct whereby the actor desired to bring about the result that followed or at least was aware that it was substantially certain to follow, so that such desire can be implied." *King v. Breach*, 115 Pa.Cmwlth. 355, 540 A.2d 976, 981 (1988). Six years later, the Pennsylvania Supreme Court held that a higher standard applied to the police conduct at issue in that case. *Renk v. Pittsburgh*, 537 Pa. 68, 641 A.2d 289, 293 (1994). In order to exclude police officers from the protection of immunity under the Tort Claims Act, the police officer's "willful misconduct" must be established in addition to the elements of an intentional tort. *Renk*, 641 A.2d at 293–94. Although the Third

---

11. Although there is a further exception for individual employees of the city, there are no further exceptions for the municipal defendants, the City of Philadelphia and the School District of Philadelphia, and, therefore, the municipal defendants are immune from all state claims for damages, including claims brought under the Pennsylvania Constitution.

Circuit applied the higher standard set forth in *Renk* to employees who were not police officers, holding that "willful misconduct" as used in the Tort Claims Act "requires evidence that the defendants actually knew that their conduct was illegal," *Sameric Corp. of Delaware,* 142 F.3d at 600–01, a more recent Third Circuit decision interpreted "willful misconduct" under the Tort Claims Act to be synonymous with "intentional tort." *Brown v. Muhlenberg Township,* 269 F.3d 205, 214 (3d Cir. 2001) (interpreting the Tort Claims Act in order to determine whether the state remedy in Pennsylvania constituted adequate postdeprivation process).

■ In the present case, all claims that the individual defendants were negligent under state law are barred by the Tort Claims Act. The amended complaint also alleges willful misconduct, and these actions do not come within the Tort Claims Act immunity. Therefore, the motions to dismiss the individual defendants as to the negligence claims are granted and the motions to dismiss the individual defendants as to the willful misconduct claims are denied. The remaining question is whether the motions to dismiss the claims that individual defendants' willful misconduct violated the Pennsylvania Constitution should be granted for failure to state a right of action.

The question of whether there exists a "right of action for money damages against governmental officials for violations of the Pennsylvania Constitution" is unclear. *Robbins v. Cumberland County Children and Youth Serv.,* 802 A.2d 1239, 1251 (Pa. Cmwlth.2002); *see also Erdman v. Mitchell,* 207 Pa. 79, 56 A. 327, 331 (1903) (holding that there is a right of action for injunctive relief under the first article of the Pennsylvania Constitution); *Commonwealth v. National Gettysburg Battlefield Tower, Inc.,* 454 Pa. 193, 311 A.2d 588

(1973) (holding that the environmental protection amendment to the Pennsylvania Constitution, found in article 1, section 27, was not self-executing and distinguishing that section from the remaining sections of article 1); *Kaucher v. County of Bucks,* No. 03–1212, 2005 U.S. Dist. LEXIS 1679, at *31–32, 2005 WL 283628, at *11 (E.D.Pa. Feb.7, 2005) (stating, "[i]t has been widely held that the Pennsylvania Constitution does not provide a direct right to damages"); *Mulgrew v. Fumo,* No. 03–CV–5039, 2004 U.S. Dist. LEXIS 14654, at *6–8, 2004 WL 1699368, at *2 (E.D.Pa. July 29, 2004) (indicating that it was unclear whether *Erdman* applied to claims for money damages and declining to exercise supplemental jurisdiction over the state constitutional issues because they presented novel issues of state law); *Harley v. Schuylkill County,* 476 F.Supp. 191, 195–96 (E.D.Pa.1979) (extending *Erdman* to apply to claims for damages); *Jones v. City of Philadelphia,* 68 Pa. D & C.4th 47, 68–75 (Pa.Com.Pl.2004) (writing extensively in support of its determination that article 1 of the Pennsylvania Constitution is self-executing and permits private parties to seek civil remedies for constitutional violations).

Given the embattled status of the law in this area, and given that further discovery for the federal claims against the municipal defendants and the state claims against the individual defendants will overlap substantially, and given that, as the case progresses, there may be further enlightenment of this issue by state court decisions, I will deny defendants motion to dismiss the state constitutional claims as to the individual defendants without prejudice to the defendant to re-assert at a later stage in the litigation.

## V. CONCLUSION

The motions to dismiss the federal claims for damages against the individual

defendants are granted on the basis of qualified immunity. The motions to dismiss the state law claims against the individual defendants are denied without prejudice. The motions to dismiss the federal claims against the municipal defendants are denied. The motions to dismiss the state law claims for damages against the municipal defendants are granted. The motion to dismiss the claims against the ancillary municipal defendants is granted.